## S98A0328. PICKREN v. THE STATE.
### (500 SE2d 566)

CARLEY, Justice.

The State is seeking imposition of the death penalty against Tommy Lamar Pickren for the murder of Deputy Sheriff Brett Dickey. We granted Pickren's application for interim appeal pursuant to OCGA § 17-10-35.1, in order to address the trial court's approval of the admission of victim impact statements and the State's use of a videotaped reenactment of the crime.

1. Although Pickren contends that the victim impact statements are voluminous, the transcript shows that both the State and the trial court made extensive deletions from the statements of the eight victim impact witnesses. The edited statements contain about eleven double-spaced, typed pages of actual text, excluding blank spaces. In previous cases, we did not and could not establish any rigid limitations on the volume of victim impact statements. *Simpkins v. State,* 268 Ga. 219, 223 (3) (486 SE2d 833) (1997); *Turner v. State,* 268 Ga. 213, 215 (2) (b) (486 SE2d 839) (1997). We find no abuse of discretion with respect to the volume of the victim impact statements in this case.

Pickren further asserts that the victim impact statements are highly emotional. The General Assembly has authorized the admission, in capital cases, of evidence of "the emotional impact of the crime on the victim, the victim's family, or the community," if presented "in such a manner and to such a degree as not to inflame or unduly prejudice the jury." OCGA § 17-10-1.2 (a) (1). " '[W]e presume that trial courts will follow the dictates of the statute in not admitting inflammatory or unduly prejudicial evidence[.] . . .' [Cit.]" *Jones v. State,* 267 Ga. 592, 595 (2) (b) (481 SE2d 821) (1997). It is because of this safeguard that the statute is constitutional. *Livingston v. State,* 264 Ga. 402, 405 (1) (c) (444 SE2d 748) (1994). See also *Payne v. Tennessee,* 501 U. S. 808 (111 SC 2597, 115 LE2d 720) (1991). Pickren specifically complains about the statement of Deputy Dickey's widow, which summarizes the emotional impact of his death on her, her mother-in-law, her father, her child, and the community.

Although this statement, like the statement approved in *Payne v. Tennessee*, supra, is poignant in places, it neither encourages "the jury to impose the death penalty based on the victim's class or wealth," nor crosses "the line to a highly emotional and inflammatory appeal to the jury's passions and prejudices." *Simpkins v. State*, supra at 223 (3). See also *Jones v. State*, supra at 595 (2) (a). The State has a legitimate interest in reminding the jury that " 'the victim is an individual whose death represents a unique loss to society and in particular to his family.' [Cit.]" *Payne v. Tennessee*, supra at 825. The trial court's expressed purpose in editing the statements was to comply with *Turner v. State*, supra, which approved a focus "on the witnesses' relationship with the victim and how the victim's death had affected the witness personally," but not "on the victim's social status" or "a 'detailed narration of . . . emotional and economic sufferings of the victim's family.' " *Turner v. State*, supra at 215 (2) (b). The trial court did not abuse its discretion in editing the statements so as to accomplish that purpose. In fact, it appears that the trial court's deletions satisfied many of Pickren's objections below.

Pickren also urges that the victim impact statements contain many religious references. If victim impact evidence is not unduly inflammatory or prejudicial, it is admissible to show that the victim was a unique individual and to provide a "glimpse into the life" of the victim, by describing "the victim's 'personal life, family life, employment, recreation, church, et cetera.' " *Simpkins v. State*, supra at 223 (3). See also *Jones v. State*, supra at 595 (2) (a). "This Court has held that the death penalty may not be imposed due to passion engendered by religious principles and beliefs." *Turner v. State*, supra at 215 (2) (b). See also *Livingston v. State*, supra at 404 (1) (b). However, religious references are not forbidden and, in *Turner v. State*, supra at 215 (2) (b), we approved references to the victim's "new found faith and spirituality" and status as a "dedicated member of his church family." Even if there are more religious references here than in *Turner*, those references do not comprise an unduly large portion of the statements. As *Turner* did not establish a limit on the number of pages of victim impact statements, neither did it establish the outer limits for religious references. For example, in the case of a minister, a substantial part of the impact of his death would necessarily include his work as a clergyman. Indeed, when *Payne v. Tennessee*, supra, upheld the admission of victim impact statements, one of the cases overruled was *South Carolina v. Gathers*, 490 U. S. 805 (109 SC 2207, 104 LE2d 876) (1989), wherein the victim was a minister of sorts and there were extensive religious references. While Deputy Dickey was not an ordained minister, neither was he an ordinary layman. He was both a music leader and a youth leader whose faith and church activities are an essential part of a "glimpse into his life." See

*Simpkins v. State,* supra at 223 (3). The impact of Deputy Dickey's death on his church is an essential part of the impact of his death on the community in which he lived. Thus, we find that the trial court did not abuse its broad discretion with regard to allowing the references to religion in the victim impact statements.

2. The trial court approved the State's use of a videotaped reenactment of the crime as "demonstrative evidence" in the opening statement or at the beginning of trial, but specifically prohibited the tape from being considered as "evidence" or being made available to the jury during deliberations. "Demonstrative" evidence is actually received into evidence and does go out with the jury when it retires for deliberation. Agnor's Ga. Evid., § 15-1, p. 452 (3d ed.); Green, Ga. Law of Evid., § 87.1, p. 177 (4th ed.). On the other hand, certain materials may be used as tools to illustrate testimony without being admitted as demonstrative evidence, but not where the illustrative material contains erroneous or prejudicial matter unauthenticated by the testimony which it purports to illustrate. Agnor, supra at p. 451; *Long v. Serritt,* 102 Ga. App. 550, 551 (1) (117 SE2d 216) (1960). Thus, if a videotape is admissible "demonstrative" evidence, it should go out with the jury, but, if a videotape is a mere tool to illustrate testimony, it is not demonstrative "evidence."

In either case, however, "posed movies which are substantially different from the facts of a case, and which because of the differences might be prejudicial and misleading to a jury, should not be used at trial. [Cit.]" *Gates v. State,* 244 Ga. 587, 591 (1) (261 SE2d 349) (1979). Although the use of a reenactment is a matter for the trial court's discretion, the party seeking to use it must show that it is a fair and accurate representation of the events sought to be depicted. See *Cornell v. State,* 265 Ga. 904, 905 (2) (463 SE2d 702) (1995).

> [Where] videotapes . . . do not portray original facts in controversy, but rather represent one party's staged reproduction of those facts[,] . . . the extreme vividness and verisimilitude of pictorial evidence is truly a two-edged sword. For not only is the danger that the jury may confuse art with reality particularly great, but the impressions generated by the evidence may prove particularly difficult to limit or, if the film is subsequently deemed inadmissible, to expunge by judicial instruction.

2 McCormick on Evidence, § 214, p. 19 (4th ed. 1992).

> "A motion picture of the artificial recreation of an event may unduly accentuate certain phases of the happening, and

because of the forceful impression made upon the minds of the jurors by this kind of evidence, it should be received with caution. As pointed out in Wigmore, such a portrayal of an event is apt to cause a person to forget that 'it is merely what certain witnesses say was the thing that happened. . . .' ([Cit.])"

*Eiland v. State,* 130 Ga. App. 428, 430 (1) (203 SE2d 619) (1973). Compare *Gates v. State,* supra at 591-592 (1) (involving a pictorial confession at the crime scene rather than a posed reenactment); *Grant v. State,* 171 S2d 361, 363-364 (Fla. 1965) (voluntary reenactment by accused); *People v. Dabb,* 197 P2d 1, 5 (Cal. 1948) (voluntary reenactment by accused). For these reasons, most jurisdictions require the party offering a filmed reenactment in a criminal case "to lay a proper foundation showing that the video tape or film accurately portrays the event in question . . . [and] that the reenactment was filmed under conditions substantially similar to those existing at the time of the event." *State v. Leroux,* 584 A2d 778, 781 (N.H. 1990). Moreover, use of a videotaped reenactment is unauthorized "where the situation or event sought to be depicted is simple, the testimony adequate, and the picture adds *nothing except the visual* image to the mental image already produced." (Emphasis in original.) *Eiland v. State,* supra at 429 (1).

The reenactment here, as in *Eiland,* was taped in daylight whereas the events actually occurred after dark. Thus, the details in the reenactment, especially gestures and facial expressions, are portrayed more clearly than they could have been seen by the actual witnesses to the crime. Furthermore, the videotape depicts all critical facts as they will be "contended for by the state." *Eiland v. State,* supra at 430 (1). Therefore, the reenactment, whether admitted into evidence or used for illustrative purposes only, would have the effect of preconditioning the minds of the jurors to accept the State's theory. See *French v. City of Springfield,* 357 NE2d 438, 442 (Ill. 1976). If use of such a videotape by the State were authorized, defendants with sufficient funds would stage their own reenactments of what they claim occurred at the time of the crimes in question. See *Commonwealth v. Nadworny,* 566 NE2d 625, 627 (2) (Mass. App. Ct. 1991); *State v. Trahan,* 576 S2d 1, 7-8 (La. 1990). This would lead to trial by taped reenactments. The State has not shown that the oral testimony will be inadequate to explain the fairly simple events depicted in the videotape. See *Eiland v. State,* supra at 429 (1). Because it appears that, under the circumstances, the pictorial representation would tend to become an "extra witness" against Pickren, we find that the trial court erred in approving the State's use of the reenactment videotape.

*Judgment affirmed in part and reversed in part. All the Justices concur, except Benham, C. J., and Sears, J., who concur in part and dissent in part.*

BENHAM, Chief Justice, concurring in part and dissenting in part.

Because of the reservations about victim impact evidence which I expressed in my dissent in *Livingston v. State,* 264 Ga. 402 (444 SE2d 748) (1994), and because the volume of victim impact evidence permitted by the trial court is greater and the evidence more inflammatory in this case than that which we permitted in *Raulerson v. State,* 268 Ga. 623 (13) (491 SE2d 791) (1997), I cannot agree with the conclusion in Division 1 of the majority opinion that there was no error in ruling victim impact evidence admissible in this case. Accordingly, since I concur with the holding in Division 2, I must concur in part and dissent in part.

I am authorized to state that Justice Sears joins in this dissent.

DECIDED MAY 18, 1998.

*J. Michael Treadaway, Ray Gary, Jr.,* for appellant.
*Roger G. Queen, District Attorney, Joe W. Hendricks, Jr., Assistant District Attorney,* for appellee.