## S02A1654. FOSTER v. THE STATE.
### (573 SE2d 60)

THOMPSON, Justice.

Defendant Michael Lebron Foster was convicted of murder in connection with the death of Cameron Jacob Bryan, a two-year-old child.[1] He appeals, asserting, inter alia, the trial court erred in permitting the jury to watch a videotape in which Foster participated in a demonstration reenacting the crime. We find no error and affirm.

On September 11, 2001, Christine Bryan, Jacob's mother, left Jacob in the care of Foster, her live-in boyfriend. Around noon, Foster called Christine Bryan and informed her that Jacob was having trouble breathing. As Christine drove home, Foster called again and asked her to hurry up. When Christine arrived, Foster was standing in the driveway, holding Jacob in a blanket. Christine called 911, and the couple attempted mouth-to-mouth resuscitation; they were unsuccessful. The EMS workers arrived in short order. They, too, were unable to revive Jacob and he died soon thereafter.

Foster told the police that he found Jacob hanging by his t-shirt from a bedpost, face-down over the floor. He explained that Jacob had been jumping on the bed; and that he probably fell, got caught on the bedpost, and was catapulted to the floor. (The bedpost was approximately 25 inches high; the floor was carpeted.) He added that when he found Jacob, he took a washcloth, wet it, put it on Jacob's forehead, and checked his vital signs.

Dr. Venea Revell performed an autopsy on Jacob. The autopsy revealed very significant skull fractures to the back of Jacob's head,[2] a fresh bruise on his forehead, a bruise on the back of his right thigh, a small laceration on his neck, and an injury to his neck that was similar to "whip lash." Dr. Revell also found pattern bruising to the face, which, she opined, was probably caused by pressure from a material made of terry cloth. Based on those findings, Dr. Revell determined that Jacob's injuries could not have been caused by falling from a bed. Rather, she opined that Jacob was killed as a result of a fatal head injury: "My explanation was that someone . . . placed the washcloth on the head . . . put their hand over the head and slammed the head twice onto a very hard surface."

---

[1] The crime occurred on September 11, 2001. The grand jury indicted Foster on February 8, 2002, and charged him with malice murder and felony murder (predicated on the underlying felony of cruelty to children). Trial commenced on April 8, 2002, and the jury found Foster guilty on both counts of the indictment on April 11. The trial court merged the felony murder conviction with the malice murder conviction and sentenced Foster to life in prison. Foster filed a timely notice of appeal. The case was docketed in this Court on July 17, 2002, and submitted for decision on the briefs on September 9, 2002.

[2] Dr. Revell averred that a child would have had to fall three or four stories in order to sustain such skull fractures.

1. The evidence was sufficient to enable any rational trier of fact to find Foster guilty beyond a reasonable doubt of malice murder. *Jackson v. Virginia*, 443 U. S. 307 (99 SC 2781, 61 LE2d 560) (1979); *Banks v. State*, 271 Ga. 59 (518 SE2d 415) (1999).

2. Three days after Jacob's death, two police officers returned to the house with a video recorder and a child-size mannequin[3] and asked Foster to show what happened to Jacob "for the camera." Foster did so willingly.[4] He retrieved one of Jacob's t-shirts and it was placed on the mannequin. Then, using the mannequin, Foster demonstrated the position in which he found Jacob at the time of the "accident" and what he did to render aid. One of the officers questioned Foster's version of events pointing out that, with the mannequin's t-shirt on the bedpost, the mannequin's face did not touch the floor; and that, if the mannequin were pushed further down, the t-shirt came off the bedpost.

Foster filed a motion in limine to prevent the State from using the videotape. The trial court denied the motion and allowed the jury to watch the recording. In so doing, however, the trial court gave the following instruction:

> Ladies and gentlemen, you have just seen a videotape that shows Special Agent James Garmon and the defendant, Michael Foster. The tape was made by Detective R. L. Moultrie. There is a doll, a CPR doll, in the videotape. I charge you that such reenactments may be useful tools in determining the course of an investigation. However, I caution you that you are to be the sole finders of fact as to whether any such re-enactment is accurate or whether the CPR doll and its clothing properly reflect the conditions that may or may not have existed in any location which is important to this case.

Foster asserts the trial court erred in admitting the videotape into evidence. In this regard, he argues that the recording constituted a reenactment which was substantially different from the facts of the case and, therefore, misleading to the jury. We disagree.

Generally, "posed movies which are substantially different from the facts of a case, and which because of the differences might be prejudicial and misleading to a jury, should not be used at trial. [Cit.]" *Gates v. State*, 244 Ga. 587, 591 (1) (261 SE2d 349) (1979).

---

[3] The mannequin was used for CPR training techniques. Its height and girth approximated Jacob's, but it was not weighed.

[4] Foster was not placed under arrest at that time. In fact, he was not under arrest for another five days.

Thus, a party seeking to use a reenactment must demonstrate that it fairly and accurately represents the event in question. *Pickren v. State*, 269 Ga. 453, 455 (2) (500 SE2d 566) (1998). That is because, ordinarily, video recordings

> do not portray original facts in controversy, but rather represent one party's staged reproduction of those facts[,] the extreme vividness and verisimilitude of pictorial evidence is truly a two-edged sword. For not only is the danger that the jury may confuse art with reality particularly great, but the impressions generated by the evidence may prove particularly difficult to limit or, if the film is subsequently deemed inadmissible, to expunge by judicial instruction.

(Punctuation omitted.) Id., quoting 2 McCormick on Evidence, § 214, p. 19 (4th ed. 1992).

The rule is different, however, where the defendant voluntarily participates in the reenactment because "when the events which are being photographed consist of a voluntary reenactment by the accused of what occurred, there is little, if any, danger of misleading emphasis which is unfavorable to him." *People v. Dabb*, 197 P2d 1, 5 (Cal. 1948). See also *Grant v. State*, 171 S2d 361, 363-364 (Fla. 1965).

In this case, Foster voluntarily participated in the reenactment, giving his version of the events in question; he had ample opportunity to cross-examine the officer who testified to the circumstances surrounding the making of the video; and the trial court instructed the jury that it was to decide whether the reenactment was an accurate portrayal of the events. Thus, the danger that the videotape falsified events, or became an "extra witness" against Foster, was minimized. *Pickren*, supra at 456. And it cannot be said that the trial court abused its discretion in admitting the videotape into evidence. *Gates v. State*, supra; see *Pickren*, supra at 455 (use of a reenactment is a matter for the trial court's discretion).

3. On cross-examination, defense counsel sought to disparage Dr. Revell's opinion (that Jacob's head injuries were inconsistent with a fall from a bed) by questioning her about two scholarly articles. Dr. Revell was familiar with the first article and counsel cross-examined her about it at length. Because Dr. Revell was not familiar with the second article, counsel read it aloud, asking Dr. Revell for her opinion as he went along. When counsel began to question Dr. Revell about the first of 18 case studies in the article, the State interposed an objection. The trial court ruled that, although counsel was free to ask about conclusions set forth in the article, he could not inquire about each of the case studies used to formulate those conclusions. Foster assigns error to that ruling, asserting the trial court improperly cur-

tailed his cross-examination of Dr. Revell. We disagree.

The trial court is vested with a broad discretion when it comes to limiting the scope of cross-examination. *Johnson v. State*, 270 Ga. 234, 235 (2) (507 SE2d 737) (1998). The trial court did not abuse its discretion in this case. It did not cut off all questions about the second article; it simply restricted the cross-examination to the conclusions reached therein. "[T]he Confrontation Clause guarantees an opportunity for effective cross-examination, not cross-examination that is effective in whatever way and to whatever extent, the defense might wish." (Punctuation omitted.) *Kolokouris v. State*, 271 Ga. 597, 600 (4) (523 SE2d 311) (1999), quoting *Johnson v. State*, 258 Ga. 504, 505 (3) (371 SE2d 651) (1988).

*Judgment affirmed. All the Justices concur.*

DECIDED NOVEMBER 25, 2002.

*Joshua D. Earwood, Lance T. McCoy*, for appellant.

*T. Joseph Campbell, District Attorney, Thurbert E. Baker, Attorney General, Jennifer S. Gill, Assistant Attorney General*, for appellee.