## S02P1377. LAWLER v. THE STATE.
### (576 SE2d 841)

HINES, Justice.

Gregory Paul Lawler shot Atlanta police officers John Sowa and Patricia Cocciolone, killing Officer Sowa and severely wounding Officer Cocciolone. A jury found him guilty of malice murder, aggravated battery on a peace officer, and other crimes. The jury recommended a death sentence for the murder after finding the following aggravating circumstances: that the murder of Officer Sowa was committed while Lawler was engaged in the commission of an aggravated battery on Officer Cocciolone; and that the murder was committed against a peace officer while he was engaged in the performance of his official duties. OCGA § 17-10-30 (b) (2), (8). Lawler

appeals. We affirm.[1]

1. The evidence adduced at trial showed the following: Lawler and his girlfriend, Donna Rodgers, were drinking at a bar near their Atlanta apartment at approximately 9:00 p.m. on Sunday, October 12, 1997. Ms. Rodgers was very intoxicated. They left the bar and began walking home when they had some type of altercation in the parking lot of a pawn shop. A person at a nearby gas station believed that Lawler was striking an intoxicated Ms. Rodgers with a bag. He drove to a police station and reported what he had seen. Officer Cocciolone and Officer Sowa went to the parking lot and observed Ms. Rodgers sitting on a curb with Lawler trying to pull her to her feet. Lawler left the scene and walked to the apartment when the police arrived. The officers did not pursue Lawler; since Ms. Rodgers was intoxicated and lived only a short distance away, they decided to help her get home. The placed her in a patrol car and drove to her and Lawler's apartment, which was a two-story townhouse-style apartment with a ground floor door.

They parked on the street, escorted her up the walk (witnesses testified that she had difficulty standing), and knocked on the door. Lawler opened the door and began yelling "get the f— away from my door" at the officers. After Ms. Rodgers was inside, he tried to shut the door on them. Officer Sowa put a hand up to prevent the door from shutting and said they were just trying to confirm that Ms. Rodgers lived there and that she would be okay. Lawler grabbed an AR-15 rifle he had placed next to the door when he saw the officers arrive and opened fire on the officers as they fled for cover. A neighbor testified that she heard a young man's voice shout, "Please don't shoot me"; another neighbor testified that she saw Lawler emerge from the apartment firing a gun; and a third neighbor testified that she saw the officers running with their backs to the apartment during the shooting. Lawler fired fifteen times; the police found three shell cas-

---

[1] Lawler committed the crimes on October 12, 1997. He was indicted on November 7, 1997, for malice murder, felony murder, aggravated assault on a peace officer (two counts), aggravated battery on a peace officer, and possession of a firearm during the commission of a felony (two counts). The State filed a notice of intent to seek the death penalty on November 20, 1997. Lawler's trial took place from January 20 to March 3, 2000. The jury convicted him of all counts on March 1, 2000, and recommended the death penalty for the malice murder on March 3, 2000. In addition to the death sentence, the trial court sentenced Lawler to twenty years for aggravated battery on a peace officer and twenty years for aggravated assault on a peace officer, to run concurrent to each other and consecutive to the death sentence, and five years for each count of possession of a firearm during the commission of a felony, to run concurrent to each other and consecutive to the death sentence. The trial court merged the other aggravated assault on a peace officer conviction with the malice murder, and the felony murder conviction is vacated by operation of law. *Malcolm v. State*, 263 Ga. 369 (4) (434 SE2d 479) (1993). Lawler filed a motion for new trial on March 31, 2000, which was denied by the trial court on April 26, 2002. The case was docketed in this Court on May 28, 2002, and orally argued on September 23, 2002.

ings inside the apartment and the remainder outside the apartment. A fourth neighbor testified that seconds after the shooting he saw Lawler standing over the crumpled form of Officer Cocciolone holding what appeared to be a rifle; Lawler then ran back into the apartment. Lawler had fired penetrator bullets, which can pierce police body armor.

Officer Cocciolone managed to send a radio distress call and other police officers arrived at the scene. They found the victims in front of Lawler's apartment, with Officer Sowa lying next to a parked car near the sidewalk and Officer Cocciolone collapsed on the front yard. Both officers still had their pistols snapped into their holsters. Officer Sowa was shot five times in the back, buttocks, and chest, and, according to the medical examiner, died almost immediately. Officer Cocciolone was hit three times in the head, arm, and buttocks. Despite a shattered pelvis, damaged intestines, and permanent brain injury, she survived and testified at Lawler's trial.

One of the responding officers, Sergeant Adams, peered through Lawler's front window and saw Ms. Rodgers sitting on the floor. He opened the front door and entered the apartment. While inside, he heard footfalls upstairs and the sound of a rifle action being worked so he retreated from the apartment and took Ms. Rodgers with him. After a six-hour stand-off, a hostage negotiator convinced Lawler to surrender. The murder weapon, the AR-15 rifle, was found in the apartment along with numerous other firearms and several different types of ammunition. Lawler's co-worker testified that Lawler had expressed his "extreme dislike" of the police and stated that if any tried to enter his home he would be ready for them.

The evidence was sufficient to enable a rational trier of fact to find beyond a reasonable doubt that Lawler was guilty of malice murder, felony murder, aggravated battery on a peace officer, two counts of aggravated assault on a peace officer, and two counts of possession of a firearm during the commission of a felony. *Jackson v. Virginia*, 443 U. S. 307 (99 SC 2781, 61 LE2d 560) (1979). The evidence was also sufficient to authorize the jury to find beyond a reasonable doubt the existence of the statutory aggravating circumstances which support his death sentence for the murder. *Jackson v. Virginia*, supra; OCGA § 17-10-35 (c) (2).

2. Lawler's evidence failed to establish a constitutional or statutory fair-cross-section violation with regard to the Fulton County grand and traverse jury lists. See *Morrow v. State*, 272 Ga. 691 (1) (532 SE2d 78) (2000); OCGA § 15-12-40; Unified Appeal Procedure, Rule II (C) (6).

There is no constitutional guarantee that grand or petit juries, impaneled in a particular case, will constitute a rep-

resentative cross-section of the entire community. [Cit.] The proper inquiry concerns the procedures for compiling the jury lists and not the actual composition of the grand or traverse jury in a particular case. [Cit.]

*Torres v. State*, 272 Ga. 389, 391 (4) (529 SE2d 883) (2000).

3. Lawler complains about the State's use of victim-impact evidence in the sentencing phase. The State presented five victim-impact witnesses: Officer Sowa's widow, mother, father, sister, and a fellow officer who was a friend. Lawler concedes that the brief testimony of these witnesses complied with the procedures for the admission of victim-impact evidence outlined by this Court in *Turner v. State*, 268 Ga. 213 (2) (a) (486 SE2d 839) (1997). The witnesses reduced their statements to writing, and these statements were reviewed before trial by the court, who ordered some redactions of potentially improper material. See id. In addition, the court ordered a "dry run" of these witnesses during the trial without the jury present. Lawler thus had several opportunities to challenge the proposed testimony, and we conclude that the brief testimony eventually placed before the jury was not improper or unduly prejudicial. See id. at 215-216 (2) (b); *Pickren v. State*, 269 Ga. 453 (1) (500 SE2d 566) (1998); *Jones v. State*, 267 Ga. 592 (2) (a) (481 SE2d 821) (1997). The trial court also charged the jury several times on the purpose of victim-impact evidence. Most of Lawler's complaints about the victim-impact testimony concern its effect rather than its substance. He alleges that several witnesses became emotional during their testimony and that some jurors also cried. The record reveals that there was some crying by witnesses and jurors; the trial court noted during the discussion of Lawler's objection, when the jury was not present, that the testimony of Officer Sowa's mother had been "sad." However, the record does not reveal any outbursts or displays of emotion that would unduly prejudice the defendant. See *Jones*, supra at 595-596 (2) (b). The testimony to be primarily guarded against in death penalty trials involves the use of arbitrary factors in the decision to impose a death sentence, such as race or religion, and not the emotion caused by the defendant's actions and the ensuing loss. See id.; *Livingston v. State*, 264 Ga. 402 (1) (b) (444 SE2d 748) (1994); OCGA § 17-10-35 (c) (1). Trials often involve witnesses who testify before a jury about traumatic or sad events; their testimony is not unconstitutional because it is poignant. See *Pickren*, supra at 454. We find that the trial court did not abuse its discretion in denying Lawler's objection to the victim-impact testimony. See *Jones*, supra.

4. We find no error with the trial court's denials of Lawler's motions to suppress evidence.

(a) Lawler's claim that he was illegally stopped or detained in

the pawn shop parking lot is without merit. See *Terry v. Ohio*, 392 U. S. 1 (88 SC 1868, 20 LE2d 889) (1968). The evidence at trial showed that he was neither stopped nor detained; in fact, he admitted at trial that he left after the officers arrived, and he testified, "I wasn't being chased or anything. So apparently the police didn't want to arrest me."

(b) During the stand-off, a police officer seized a shell casing from in front of Lawler's apartment to see if Lawler was armed with a weapon that "will defeat the body armor that we wear." After Lawler surrendered, the SWAT team swept the apartment "looking for any other possible suspects or victims." The SWAT team noticed black powder and chemicals, and the bomb squad then swept the apartment to "make sure there was nothing inside that was dangerous." All of these warrantless searches were proper and reasonable. See *Delay v. State*, 258 Ga. 229, 230 (2) (b) (367 SE2d 806) (1988).

> [W]hen the police come upon the scene of a homicide they may make a prompt warrantless search of the area to see if there are other victims or if a killer is still on the premises. [Cit.] The need to protect or preserve life or avoid serious injury is justification for what would be otherwise illegal absent an exigency or emergency. [Cit.] And the police may seize any evidence that is in plain view during the course of their legitimate emergency activities. [Cit.]

*Delay*, supra, quoting *Mincey v. Arizona*, 437 U. S. 385, 392-393 (98 SC 2408, 57 LE2d 290) (1978).

(c) The police obtained a search warrant for Lawler's apartment at 4:20 a.m. on October 13, 1997. The items sought were "[g]uns, ammunition, clothing, shoes, and other related items to the crime of murder." Contrary to Lawler's contention, the items sought were described with sufficient particularity in the warrant. See *McBee v. State*, 228 Ga. App. 16 (3) (491 SE2d 97) (1997); *Miller v. State*, 219 Ga. App. 213 (2) (464 SE2d 621) (1995). The evidence seized pursuant to this warrant and presented at trial was admissible. Id. The officers also complied with OCGA § 17-5-25 by leaving a copy of the warrant on the premises.

(d) Lawler claims that the police improperly seized his private papers, but no private papers were admitted at trial so this argument is moot. See *Sears v. State*, 262 Ga. 805 (3) (426 SE2d 553) (1993) (the term "private papers" refers to documents protected by a legal privilege). Several books and pamphlets concerning police and military subjects, such as police warrant service, sniping (which recommended the placement of head and spinal shots to incapacitate a target), and the AR-15 rifle, were admitted at trial. These items were

found in Lawler's apartment and properly seized pursuant to the first search warrant. Contrary to Lawler's claim, the admission of these books did not violate his First Amendment rights. The First Amendment "does not prohibit the evidentiary use of speech to establish the elements of a crime or to prove motive or intent." *Wisconsin v. Mitchell*, 508 U. S. 476, 489 (113 SC 2194, 124 LE2d 436) (1993). See also *Mize v. State*, 269 Ga. 646 (3) (501 SE2d 219) (1998).

(e) The search of Lawler at the police station was a lawful search incident to his arrest. See *Thomason v. State*, 268 Ga. 298 (2) (d) (486 SE2d 861) (1997). Swabbing for blood or gunshot residue at that time was not an unconstitutional search. Id.; *Strickland v. State*, 247 Ga. 219 (18) (275 SE2d 29) (1981).

(f) Lawler claims that the magistrate who issued the search warrants was not neutral and detached because he knew Officer Cocciolone and the detectives who provided the supporting affidavits for the search warrants. The detectives testified that they saw the magistrate once or twice a year at Atlanta restaurants frequented by lawyers, court personnel, and police officers, but that was the extent of their social interaction. One detective related, "I'd have a drink there, and [the magistrate] would be there, I'd speak to him, and I would just say hey Judge. I never sat down and discussed anything or had a personal conversation with him." The magistrate testified that he knew Officer Cocciolone only from her appearances in his courtroom, and that he attempted to visit her in the hospital and did visit her once during her convalescence at her home. He did not know Officer Sowa, but did attend his funeral. We conclude that the magistrate's limited social contacts with the affiants, his visit to Officer Cocciolone after her injuries, and his attendance at Officer Sowa's funeral, did not compromise the "severance and disengagement from activities of law enforcement" required of a magistrate in order to issue a valid search warrant. See *Raulerson v. State*, 268 Ga. 623 (2) (c) (491 SE2d 791) (1997); *King v. State*, 263 Ga. 741 (2) (b) (438 SE2d 620) (1994). Lawler has failed to show that the magistrate abandoned his judicial role. *Raulerson*, supra.

(g) Lawler's claim that the second search warrant was invalid merits no appellate review because the trial court found that nothing was seized pursuant to this warrant. The trial court further found that the evidence Lawler claims was seized pursuant to the second warrant was actually validly seized pursuant to the first warrant. Thus, we find no error. See enumeration 4 (c).

(h) On October 20, 1997, Ms. Rodgers informed the police that searches of her and Lawler's apartment had missed a secret compartment in a workbench that contained weapons. She had seen the weapons there as recently as October 18. The police obtained a third search warrant and Ms. Rodgers, who had lived in the apartment for

at least three years and had signed a consent-to-search form, let them into the apartment using her key. The search for and seizure of the items in the workbench were legal pursuant to both a valid warrant and a valid consent by Ms. Rodgers. See *DeYoung v. State*, 268 Ga. 780 (7) (493 SE2d 157) (1997); *Crowe v. State*, 265 Ga. 582, 587 (6) (458 SE2d 799) (1995) ("A valid consent obviates the need for a search warrant.").

5. Lawler claims that the trial court erroneously denied his motions to excuse for cause 13 prospective jurors. However, the record reveals that Lawler did not move to excuse for cause prospective juror Gorton, and the trial court did not err by failing to excuse him sua sponte. See *Mize v. State*, 269 Ga. 646 (6) (c) (501 SE2d 219) (1998). The record also shows that prospective jurors Pfeiffer and Cheatham were excused for medical reasons before jury selection began, so Lawler's argument that they should have been excused for cause is moot. The remaining ten challenged prospective jurors were not disqualified. Their responses to propounded voir dire questions manifested that their views on capital punishment would not " 'prevent or substantially impair the performance of [their] duties as [jurors] in accordance with [their] instructions and [their] oath[s].' " *Greene v. State*, 268 Ga. 47, 48 (485 SE2d 741) (1997), quoting *Wainwright v. Witt*, 469 U. S. 412, 424 (II) (105 SC 844, 83 LE2d 841) (1985). See also *Mize*, supra at 652 (6) (d). Several of these prospective jurors indicated they had some exposure to pretrial news reports, but that the exposure was limited and that they could set aside anything they had heard or seen and base their personal verdicts only on the evidence presented in the courtroom. See *Cromartie v. State*, 270 Ga. 780 (9) (a) (514 SE2d 205) (1999). Also, the trial court did not err by denying Lawler's motions to excuse one of these prospective jurors for hardship reasons, another for mistakenly checking certain boxes on his juror questionnaire, and a third for her views on alcohol. See *Cromartie*, supra at 784-785 (9) (c); *Johnson v. State*, 271 Ga. 375 (9) (519 SE2d 221) (1999).

6. Prospective juror Brooks worked in the healthcare industry and had a background as an emergency room nurse. Lawler sought to ask her, "As a medical professional, do you have an ethical objection to medical professionals participating in executions?" We find no error with the trial court's refusal to allow the asking of this question. The scope of voir dire is largely left to the trial court's discretion, and it is not error for the trial court to exclude voir dire questions that do not deal directly with the juror's responsibilities in the case. See *Barnes v. State*, 269 Ga. 345 (10) (496 SE2d 674) (1998). Lawler was permitted to extensively question this prospective juror regarding her views about the death penalty and her ability as a juror to fairly consider the three sentencing options. See *Greene*, supra at 48-

50. Her responses showed that she was qualified to serve, and Lawler did not move to excuse her for cause. See *Mize*, supra at 652 (6) (c).

7. Lawler's claim that the trial court erred by dismissing a prospective juror for tardiness is without merit. After voir dire was completed, the prospective jurors and the parties arrived in court for jury selection on the morning of February 22, 2000. Prospective juror Petty was absent; she was the only missing prospective juror out of 73 qualified prospective jurors. Lawler objected to striking the jury with a prospective juror missing. The trial court sent sheriff's deputies to find her. The deputies called her home and work telephone numbers and searched for her for two hours, but to no avail. The trial court then ordered over Lawler's objection that she be removed from the panel, and that jury selection begin. Three additional hours passed. Finally, after jury selection and a lunch recess, prospective juror Petty appeared in the courtroom in the custody of deputies. When asked for an explanation for her non-appearance, prospective juror Petty said she knew jury service was important, but she was moving and "with everything that goes on in [her] life every day, [she] had to make a choice." The trial court, after noting that about a hundred people had waited in the courtroom for her for two hours, cited her for criminal contempt and dismissed her from court until her contempt hearing. We determine that the trial court acted reasonably and find no error. See *Herring v. State*, 224 Ga. App. 809 (1) (481 SE2d 842) (1997) (trial court did not abuse its discretion by removing juror who was late for jury duty and replacing him with an alternate juror).

8. The death sentence in this case was not imposed under the influence of passion, prejudice, or any other arbitrary factor. OCGA § 17-10-35 (c) (1). Lawler's sentence is also not excessive or disproportionate to the penalty imposed in similar cases, considering both the crimes and the defendant. OCGA § 17-10-35 (c) (3). Lawler, armed with a rifle loaded with penetrator bullets, shot and killed a police officer and seriously wounded another police officer when the officers were trying to help his intoxicated girlfriend get home safely. The cases listed in the Appendix support the imposition of the death penalty in this case as they all involve the murder of a police officer during the discharge of the officer's official duties.

*Judgment affirmed. All the Justices concur.*

### APPENDIX.

*Brannan v. State*, 275 Ga. 70 (561 SE2d 414) (2002); *Holsey v. State*, 271 Ga. 856 (524 SE2d 473) (1999); *Speed v. State*, 270 Ga. 688 (512 SE2d 896) (1999); *Henry v. State*, 269 Ga. 851 (507 SE2d 419) (1998); *Davis v. State*, 263 Ga. 5 (426 SE2d 844) (1993); *Hill v. State*,

250 Ga. 277 (295 SE2d 518) (1982); *Wallace v. State*, 248 Ga. 255 (282 SE2d 325) (1981); *Stevens v. State*, 247 Ga. 698 (278 SE2d 398) (1981); *McCleskey v. State*, 245 Ga. 108 (263 SE2d 146) (1980); *Collier v. State*, 244 Ga. 553 (261 SE2d 264) (1979).

DECIDED JANUARY 27, 2003 —
RECONSIDERATION DENIED FEBRUARY 24, 2003.

*Michael R. Hauptman, Chandler & Britt, Walt M. Britt, Melnick & Beall, John A. Beall IV,* for appellant.

*Paul L. Howard, Jr., District Attorney, Bettieanne C. Hart, Peggy R. Katz, Anne E. Green, Assistant District Attorneys, Thurbert E. Baker, Attorney General, Mitchell P. Watkins, Assistant Attorney General,* for appellee.