## S04P1845. PERKINSON v. THE STATE.

(610 SE2d 533)

HUNSTEIN, Justice.

A Bartow County jury convicted Eric Alexander Perkinson of malice murder, three counts of felony murder, aggravated battery, two counts of aggravated assault, two counts of false imprisonment, theft by taking, possession of a firearm during the commission of a felony, and possession of a firearm by a convicted felon. The jury recommended a death sentence for the malice murder conviction after it found three statutory aggravating circumstances beyond a reasonable doubt: that the offense of murder was committed by the defendant during the commission of an armed robbery and during the commission of a kidnapping with bodily injury; and that the murder was committed by the defendant for himself or another for the purpose of receiving money or another thing of monetary value. OCGA § 17-10-30 (b) (2), (4). Finding no reversible error, we affirm the convictions and sentences.[1]

1. On June 6, 1998, the victims, 17-year-old Dakarai Sloley and 16-year-old Louis Nava, drove Sloley's aunt's white BMW automobile to pick up Sloley's dog from a dog groomer in DeKalb County. The dog was not ready so they returned to the parked BMW to wait. Eric Perkinson and an accomplice, Rico Wilson, entered the back seat of the car. At gunpoint, Perkinson and Wilson forced Sloley and Nava to drive to a nearby church parking lot. Perkinson, holding the gun, demanded and received cash from both victims. In the church parking lot, they rendezvoused with a green Toyota driven by two more accomplices who were Perkinson's brothers. Sloley was made to sit in the front passenger seat of the BMW and Nava was forced into the BMW's trunk. Wilson then drove the BMW north on I-75 for about 45 minutes to Bartow County while Perkinson remained in the back seat with the gun. The two accomplices in the Toyota followed. Sloley

---

[1] The crimes occurred on June 6, 1998. The Bartow County grand jury indicted Perkinson on August 7, 1998, for malice murder, felony murder (three counts), aggravated battery, aggravated assault (two counts), false imprisonment (two counts), theft by taking, possession of a firearm during the commission of a felony, and possession of a firearm by a convicted felon. The State filed its notice of intent to seek the death penalty on August 14, 1998. Perkinson's trial took place from August 9 to August 28, 1999. The jury convicted Perkinson of all charges on August 27, 1999, and, the following day, recommended a death sentence for the malice murder conviction. In addition to the death sentence, the trial court sentenced Perkinson to twenty years for aggravated battery, ten years for each false imprisonment conviction, twenty years for theft by taking, and five years for each firearm possession conviction, with all sentences to be served consecutively. The remaining convictions merged with other convictions or were vacated by operation of law. Perkinson filed a motion for new trial on September 15, 1999, and an amended motion for new trial on March 27, 2001. The trial court denied the amended motion for new trial on March 29, 2001, and Perkinson filed a notice of appeal on April 24, 2001. After being remanded by this Court for completion of the record on August 9, 2001, the case was docketed in this Court on July 19, 2004. It was orally argued on October 12, 2004.

asked Perkinson and Wilson not to kill them and Wilson said they would not kill them. During the drive north, the Toyota briefly passed the BMW and Sloley observed the Toyota's license plate. Wilson exited I-75 in Bartow County and Perkinson instructed him to drive the BMW to a wooded, secluded stretch of Paga Mine Road.

Wilson parked the BMW on the side of the dirt road and the Toyota stopped behind them. Wilson and Perkinson got out of the BMW and opened the trunk. Perkinson told Nava to get out and take off his shirt and shoes. Nava complied. Perkinson then marched Nava into the woods at gunpoint and shot him twice, killing him. Perkinson returned to the BMW, ordered Sloley to get out, and told him he was next. Sloley said, "I thought you weren't going to kill us." Perkinson replied, "[Y]ou already saw our faces and you got the license plate on the Corolla." While he was being marched into the woods by Perkinson, Sloley fled and Perkinson fired several shots, hitting Sloley in the left arm. Sloley fell down. Although the bone in his left arm had been severed by the bullet, he got to his feet after he heard the cars leaving and ran through the woods until he came to a road where he flagged down a pizza delivery driver. Police recovered the BMW and the Toyota within a short time and arrested Perkinson and his three accomplices. Sloley identified Perkinson both in a photo lineup and in court as the gunman. Police found Perkinson's fingerprint on the BMW and the murder weapon was found in the BMW. Perkinson told police after his arrest that he had gone to DeKalb County on June 6 in the green Toyota Corolla with his brothers and Rico Wilson, but Wilson left them in DeKalb County and he did not see the white BMW until that night in Rome when Rico Wilson was driving it. In a second statement, he said Rico Wilson told him he wanted to steal a BMW to pay off a debt. Perkinson said he did not see the carjacking, but he later saw Wilson in the BMW with three unidentified passengers. Perkinson said he and two others followed the BMW on I-75 in the Toyota, but stopped following it after it reached Bartow County. However, witnesses in Cartersville and Rome saw the BMW and the green Toyota Corolla driving around together on the night of June 6.

The evidence was sufficient to enable a rational trier of fact to find proof beyond a reasonable doubt of Perkinson's guilt of malice murder, felony murder, aggravated battery, aggravated assault, false imprisonment, theft by taking, possession of a firearm during the commission of a felony, and possession of a firearm by a convicted felon. *Jackson v. Virginia*, 443 U. S. 307 (99 SC 2781, 61 LE2d 560) (1979). The evidence also was sufficient to authorize the jury to find the three statutory aggravating circumstances beyond a reasonable doubt. Id.; OCGA § 17-10-35 (c) (2).

2. In the guilt-innocence phase, Perkinson presented evidence that he was mentally retarded. At the conclusion of the guilt-innocence phase, he moved for a directed verdict on this issue. The trial court denied the motion and he contends that this was error. We conclude that a "directed verdict was not warranted because the evidence regarding [Perkinson's] mental ability was disputed and conflicting." *Jenkins v. State*, 269 Ga. 282, 291 (15) (498 SE2d 502) (1998). " 'Mentally retarded' means having significantly subaverage general intellectual functioning resulting in or associated with impairments in adaptive behavior which manifested during the developmental period." OCGA § 17-7-131 (a) (3). Although Perkinson presented evidence that he was mentally retarded because he had done very poorly in school and because he had scored lower than 70 on IQ testing, a level which is generally accepted as an indication of significantly subaverage intellectual functioning, the State presented evidence that Perkinson had scored above 70 on two IQ tests, that his poor school performance may be related to disruptive behavior, that his adaptive ability exceeded that which is indicative of mental retardation, and that he may have malingered on recent IQ testing by the State's experts. Because there was a conflict in the evidence, the trial court did not err by allowing this issue to go to the jury. See *King v. State*, 273 Ga. 258, 272-273 (29) (539 SE2d 783) (2000); *Jenkins*, supra; OCGA § 17-9-1 (a).

3. This Court has recently addressed the defendant's burden of proof for mental retardation and held that beyond a reasonable doubt is proper. See *Head v. Stripling*, 277 Ga. 403, 410 (3) (590 SE2d 122) (2003); *Head v. Hill*, 277 Ga. 255, 261-262 (587 SE2d 613) (2003). OCGA § 17-7-131 is not unconstitutionally vague or internally inconsistent. See *King v. Hawkins*, 266 Ga. 655, 656 (469 SE2d 30) (1996) (trial court's ascertainment of a factual basis for a guilty plea need not meet the beyond a reasonable doubt standard); *Worthy v. State*, 253 Ga. 661, 666-667 (6) (324 SE2d 431) (1985).

4. The trial court did not commit reversible error in its charge to the jury on mental retardation. Although the court followed the Standard Pattern Jury Instruction on mental retardation which improperly adds "at the time of the commission of the offense" to the statutory language, the jury here was instructed as to the statutory definition of mental retardation, including the requirement that they find that the impairments in adaptive behavior manifested during the developmental period. See OCGA § 17-7-131 (a) (3). We caution courts that the improper language should not be included in future charges.

5. Perkinson claims that the trial court erred by refusing to change venue. "A trial court must order a change of venue in a death penalty case when a defendant can make a 'substantive showing of

the likelihood of prejudice by reason of extensive publicity.' [Cit.]" *Barnes v. State*, 269 Ga. 345, 347 (2) (496 SE2d 674) (1998). In order to prevail on this claim, Perkinson must show that his trial setting was inherently prejudicial as a result of pretrial publicity or that there was actual bias on the part of individual jurors. See *Gissendaner v. State*, 272 Ga. 704, 706 (2) (532 SE2d 677) (2000). When determining whether the trial setting was inherently prejudicial, courts consider the size of the community, the extent of the media coverage, and the nature of the media coverage. *Barnes*, supra. The trial court found that Bartow County was no longer a small community and that the media coverage, while extensive at times, was not inflammatory or prejudicial. Most of the news reports simply related the allegations in the indictment and other undisputed aspects of the case, such as that Perkinson had been arrested and charged with the murder of Louis Nava and other offenses, that the district attorney was seeking the death penalty, and that Perkinson was alleging that he was mentally retarded; this is information that prospective jurors were apprised of during voir dire. See *King*, supra, 273 Ga. at 261 (4). The trial court was particularly concerned with a lengthy article that appeared in the Atlanta Journal-Constitution at the beginning of voir dire that included some information that would not be admissible during the guilt-innocence phase, such as Perkinson's juvenile court record, but it determined that relatively few prospective jurors had read this article. See *Gissendaner*, supra. We conclude, upon review of the record, that the pretrial media coverage was "neither so extensive and inflammatory nor so reflective of 'an atmosphere of hostility' as to require a change of venue." Id. at 706. Compare *Tyree v. State*, 262 Ga. 395, 395-397 (1) (418 SE2d 16) (1992).

With regard to whether there was actual bias on the part of individual jurors, the State and Perkinson differ slightly on the number of prospective jurors who were excused for cause due to bias resulting from pretrial publicity. Perkinson claims that 15/100[2] prospective jurors were excused for such bias; the State claims only 13 were excused for this reason. Even assuming the higher number asserted by Perkinson, we conclude that the number of excusals for cause due to exposure to pretrial publicity does not indicate an inherently prejudicial environment for Perkinson's trial. See *Gissendaner*, supra; *Tyree*, supra at 397; *Tharpe v. State*, 262 Ga. 110, 111 (5) (416 SE2d 78) (1992); *Jones v. State*, 261 Ga. 665, 665 (1) (b), n. 2 (409

---

[2] The State argues that one of these prospective jurors was actually excused for cause for being predisposed to a death sentence and the other was excused for cause because she worked at the 911 call center which handled the 911 calls relating to this case. At trial, Perkinson had argued that 13/85 prospective jurors had been excused due to exposure to pretrial publicity, which amounts to the same excusal rate, 15%, that he claims on appeal.

SE2d 642) (1991). The trial court did not err by denying Perkinson's motion for change of venue.

6. The trial court did not err by permitting pretrial discovery by the State of Perkinson's school records. Perkinson asserts that these records were privileged under OCGA § 24-9-21 (7) because they included testing and evaluation by school counselors. Even if we assume that school records are covered by this claim of privilege, which we need not decide here, in a criminal case where the defendant raises a claim of mental retardation, putting the defendant's mental capacity at issue, "such affirmative defense waives the privilege under OCGA § 24-9-21 (5) through (8)." *Trammel v. Bradberry*, 256 Ga. App. 412, 424 (6) (568 SE2d 715) (2002). In addition, Perkinson opted-in to reciprocal discovery. OCGA § 17-16-1 et seq. OCGA § 17-16-4 (b) (2) provides that the prosecuting attorney be permitted to inspect and copy any mental examination, including a summary of the basis for the expert opinion rendered in the report, if the defendant intends to introduce in evidence in the defense's case-in-chief the results of the mental examination. Perkinson disclosed to the trial court and the State before trial that the school records formed the basis of much of his mental retardation claim. At trial, Perkinson presented the school counselor who testified about the intellectual testing and psychoeducational assessments administered to Perkinson at school and three of Perkinson's four psychoeducational reports were tendered into evidence. Both psychologists called to testify by Perkinson testified extensively about the school records and their contribution to the psychologists' opinions that Perkinson was mildly mentally retarded. The trial court did not err by allowing the State pretrial access to these records. Id.

7. On August 11, 1999, the third day of voir dire, the lawyers and the trial judge met in chambers to discuss the case. Neither the court reporter nor Perkinson was present; the lawyers later stipulated to the details of this conference. The purpose of the conference was to allow the district attorney to disclose potentially exculpatory evidence to the defense. See *Brady v. Maryland*, 373 U. S. 83 (83 SC 1194, 10 LE2d 215) (1963). Perkinson's lawyers had not intended to raise mental retardation as an issue until shortly before trial when Perkinson's school uncovered and provided to defense counsel additional school records indicating mental retardation might be a viable claim. Defense counsel retained Dr. Herendeen, a psychologist, to test and evaluate Perkinson on the eve of trial. Based on the test results and Perkinson's background, Dr. Herendeen concluded that Perkinson was mildly mentally retarded. Perkinson filed notice of his intent to raise mental retardation on July 28, 1999. The State then retained a

psychologist, Dr. Breiner, as a consultant, to examine Dr. Herendeen's report and the raw test data from Dr. Herendeen's evaluation. Based on this information, Dr. Breiner, on August 10, 1999, concurred with Dr. Herendeen's opinion that Perkinson was mildly mentally retarded; it was this concurrence that the State needed to disclose. The State then requested a continuance so that it could retain an expert to evaluate Perkinson and administer IQ testing to him as allowed by law (Dr. Breiner had not tested or evaluated Perkinson herself). See *Nance v. State*, 272 Ga. 217, 218-219 (2) (526 SE2d 560) (2000). The trial court granted an eight-day continuance so the State could obtain an expert to test and evaluate Perkinson. The lawyers also discussed a plea bargain in which Perkinson would plead guilty but mentally retarded, but Perkinson later rejected such a deal.

Perkinson argues that the trial court erroneously granted the continuance and that the in-chambers conference was a critical stage of the proceedings at which he was entitled to be present. With regard to the continuance, requests for a continuance are addressed to the sound discretion of the trial court, OCGA § 17-8-22, and we conclude that the trial court did not abuse its discretion in granting this continuance.

With regard to Perkinson's absence from the conference, we conclude that he acquiesced to the conference occurring outside his presence. See *Holsey v. State*, 271 Ga. 856, 861 (5) (524 SE2d 473) (1999) ("[A] defendant may later acquiesce in proceedings occurring in his absence"). Perkinson made no complaint regarding the continuance of his trial, which he clearly knew about, and he submitted to the mental evaluation by the State's expert without objection. See *Wilson v. State*, 274 Ga. 637 (3) (555 SE2d 725) (2001).

8. We find that the trial court did not abuse its discretion in denying Perkinson's motion for a continuance made on the eve of trial. OCGA § 17-8-22. Also, as discussed in the previous division, Perkinson's trial was in fact continued for eight days when the trial court granted the State's motion for a continuance during voir dire.

9. The trial court allowed the State to introduce into evidence during the penalty phase a videotape made months after the crime depicting the church parking lot, the inside of the BMW's trunk, and the place on Paga Mine Road where the murder occurred, the stated intent of which was to depict the crime from the perspective of the victim, Louis Nava. Perkinson alleges the admission of this videotape was error.

In considering the use of videotape evidence in *Pickren v. State*, 269 Ga. 453 (2) (500 SE2d 566) (1998), we cautioned that

> the extreme vividness and verisimilitude of pictorial evidence is truly a two-edged sword. For not only is the danger that the jury may confuse art with reality particularly great, but the impressions generated by the evidence may prove particularly difficult to limit or, if the film is subsequently deemed inadmissible, to expunge by judicial instruction.

We further acknowledged that use of a videotape is unauthorized " 'where the situation or event sought to be depicted is simple, the testimony adequate, and the picture adds nothing except the visual image to the mental image already produced.' [Cit.]" *Pickren*, supra, 269 Ga. at 456.

In this case, the introduction of the video portrayal was unauthorized in that it depicted a simple event already adequately represented by testimony and for which the portrayal added nothing to the existing mental image already created. Although we hold the admission was error, due to the brevity of the tape and the fact that it in essence was little more than the fair and accurate depiction of the crime scene and not a reenactment of the crime itself, we find the error was harmless in this case.

10. As acknowledged by Perkinson, one of his trial lawyers continues to represent him on appeal so his claim of ineffective assistance of counsel is premature. See *Berry v. State*, 262 Ga. 614, 615 (3) (422 SE2d 861) (1992); *Castell v. Kemp*, 254 Ga. 556, 557-558 (331 SE2d 528) (1985). This claim may be raised in the event Perkinson obtains new counsel.

11. While discussing sentencing options during the penalty phase closing argument, the district attorney incorrectly stated that a sentence of life imprisonment with the possibility of parole "can be only used if there are no aggravating circumstances." This argument is improper because a sentence of life imprisonment with parole is always an option for the jury regardless of whether they find the existence of any statutory aggravating circumstances. Perkinson did not object to this argument. Accordingly, a reversal is only required if there is a reasonable probability that the improper argument changed the jury's exercise of discretion in choosing between life imprisonment, life without parole, and death. See *Pace v. State*, 271 Ga. 829, 844 (32) (h) (524 SE2d 490) (1999); *Hicks v. State*, 256 Ga. 715, 730 (23) (352 SE2d 762) (1987). Because the trial court correctly and repeatedly charged the jury that life with the possibility of parole was always a sentencing option without regard to the existence of any statutory aggravating circumstances, we conclude that the prosecutor's misstatement did not reasonably alter the outcome of the penalty phase. See id.

12. During the guilt-innocence phase closing argument, the district attorney implored the jury to tell Perkinson "he's not mentally retarded, and he can't hide behind it." Perkinson objected after the prosecutor concluded his argument and moved for a mistrial outside the presence of the jury, claiming that the argument was improper because mental retardation is not a substantive, "walk-away" defense that would permit Perkinson to evade justice if he is found to be mentally retarded. The trial court denied the motion and found that mental retardation is a defense on some level and that the court's charge to the jury would rectify any possible harm. We conclude that the trial court did not err by denying the motion for mistrial. See *King*, supra, 273 Ga. at 272 (28); *James v. State*, 270 Ga. 675, 677 (4) (513 SE2d 207) (1999) (whether to grant motion for mistrial is within sound discretion of trial court). Although mental retardation, unlike insanity, is not a defense to guilt, the jury would logically understand that some benefit must accrue to Perkinson if found to be guilty but mentally retarded because he vigorously attempted to prove his mental retardation at trial and the State's experts opined that he malingered on IQ testing in an attempt to portray himself as mentally retarded. The prosecutor did not inform the jury that Perkinson could not receive a death sentence if found to be guilty but mentally retarded, and the trial court correctly charged the jury on the sentencing consequences of such a verdict. See *State v. Patillo*, 262 Ga. 259, 260 (417 SE2d 139) (1992); OCGA § 17-7-131 (b) (3) (C).

13. The statutory definition of mental retardation includes the phrase: ". . . associated with impairments in adaptive behavior which manifested during the developmental period." OCGA § 17-7-131 (a) (3). When charging the jury, the trial court substituted the words "became clear" for "manifested." Contrary to Perkinson's assertion, there is no error because the terms "manifested" and "became clear" are synonymous under these circumstances.

14. The trial court did not err by refusing to excuse prospective jurors for cause because they did not agree with defense counsel in voir dire that some of the specific, allegedly-mitigating evidence suggested by defense counsel could affect their sentencing decision. See *Lucas v. State*, 274 Ga. 640, 646 (10) (555 SE2d 440) (2001); *Carr v. State*, 267 Ga. 547, 554 (6) (a) (480 SE2d 583) (1997). The prospective jurors that Perkinson complains about were properly qualified with regard to capital punishment. See *Greene v. State*, 268 Ga. 47, 48 (485 SE2d 741) (1997).

15. Perkinson's death sentence was not imposed as the result of passion, prejudice or any other arbitrary factor. OCGA § 17-10-35 (c) (1). The death sentence also is not excessive or disproportionate to the penalty imposed in similar cases, considering both the crimes and the

defendant. OCGA § 17-10-35 (c) (3). As part of our review of the sufficiency of the evidence to support the jury's finding of statutory aggravating circumstances, OCGA § 17-10-35 (c) (2), we note that the jury found a fourth statutory aggravating circumstance beyond a reasonable doubt, but the verdict form was defective with regard to this finding. The verdict form stated: "We, the jury, find beyond a reasonable doubt that the murder of LOUIS G. NAVA was horrible or inhuman, in that it involved the torture of Louis G. Nava." This is not a correct wording of this statutory aggravating circumstance, which is that the offense of murder "was *outrageously or wantonly vile, horrible, or inhuman* in that it involved torture[.]" (Emphasis supplied.) OCGA § 17-10-30 (b) (7). The first component of the aggravating circumstance, that the murder was "outrageously or wantonly vile, horrible, or inhuman," must be found by the jury because this phrase is "included in the statute to distinguish ordinary murders for which the penalty of death is not appropriate[ ] from those murders for which the death penalty may be imposed." *Hance v. State*, 245 Ga. 856, 861 (3) (268 SE2d 339) (1980). See also *Black v. State*, 261 Ga. 791, 796-797 (18) (410 SE2d 740) (1991). Perkinson's jury did not make this finding, and therefore, we vacate this statutory aggravating circumstance. See *Page v. State*, 256 Ga. 191, 194 (7) (345 SE2d 600) (1986). Perkinson's death sentence is unaffected because it is supported by the jury's finding of three other statutory aggravating circumstances. See *Colwell v. State*, 273 Ga. 634, 642 (11) (d) (544 SE2d 120) (2001).

Perkinson was the gunman and apparent leader in the carjacking, kidnapping, and execution-style murder of one victim and the attempted execution-style murder of a second victim. Considering the evidence, the cases listed in the Appendix support the imposition of the death penalty in this case, in that all involve murders committed during an armed robbery or kidnapping with bodily injury.

*Judgment affirmed. Carley, Thompson, and Hines, JJ., and Judge Cynthia Becker, concur. Fletcher, C. J., and Sears, P. J., concur in part and dissent in part. Benham, J., disqualified.*

APPENDIX.

*Raheem v. State*, 275 Ga. 87 (560 SE2d 680) (2002); *Butts v. State*, 273 Ga. 760 (546 SE2d 472) (2001); *King v. State*, 273 Ga. 258 (539 SE2d 783) (2000); *Esposito v. State*, 273 Ga. 183 (538 SE2d 55) (2000); *Wilson v. State*, 271 Ga. 811 (525 SE2d 339) (1999); *Sears v. State*, 270 Ga. 834 (514 SE2d 426) (1999); *Lee v. State*, 270 Ga. 798 (514 SE2d 1) (1999); *Jenkins v. State*, 269 Ga. 282 (498 SE2d 502) (1998); *Bishop v. State*, 268 Ga. 286 (486 SE2d 887) (1997); *Jones v. State*, 267 Ga. 592 (481 SE2d 821) (1997); *Carr v. State*, 267 Ga. 547 (480 SE2d 583)

(1997); *Hammond v. State*, 264 Ga. 879 (452 SE2d 745) (1995); *Tharpe v. State*, 262 Ga. 110 (416 SE2d 78) (1992); *Lynd v. State*, 262 Ga. 58 (414 SE2d 5) (1992); *Potts v. State*, 259 Ga. 96 (376 SE2d 851) (1989); *Moon v. State*, 258 Ga. 748 (375 SE2d 442) (1988); *High v. State*, 247 Ga. 289 (276 SE2d 5) (1981).

SEARS, Presiding Justice, dissenting in part.

While I concur with the majority's affirmance of the jury's guilty verdicts, I dissent to the majority's affirmance of the death sentence based upon the reasons outlined in my dissent to *Head v. Hill*.[3]

I am authorized to state that Chief Justice Fletcher joins in this dissent.

DECIDED MARCH 14, 2005 —
RECONSIDERATION DENIED APRIL 14, 2005.

*Christopher G. Paul*, for appellant.

*T. Joseph Campbell*, District Attorney, *Thurbert E. Baker*, Attorney General, *Mitchell P. Watkins*, *Patricia B. Attaway Burton*, Assistant Attorneys General, for appellee.

[3] 277 Ga. 255, 269 (587 SE2d 613) (2003).