S02A1454. RICKETTS v. THE STATE.
(579 SE2d 205)

HINES, Justice.

Gregory Ricketts appeals his convictions for the malice murder of his wife, Sharla Ricketts, and for intercepting communications which invade the privacy of another. He claims that his convictions must be reversed because his motion to suppress was improperly denied; venue was not pled in the bill of indictment; closing argument was improperly limited to one hour; trial counsel was ineffective for failing to object to the one-hour limitation of closing argu-

ment; the trial court's instruction to the jury was erroneous; he was not present at a critical stage of the trial; and the trial court communicated with the jury foreperson to the exclusion of the other jurors. Finding that Ricketts's claims of error fail to provide a basis for the reversal of his convictions, we affirm.[1]

The evidence construed in favor of the verdicts showed the following: Gregory Ricketts ("Ricketts") and Sharla Ricketts were married in August 1994. Ricketts was part owner of an adult entertainment club in Athens, and met Sharla when she was employed as a waitress at the club. After the two were married, Sharla went to work as a dancer in an adult entertainment club in Cobb County. The two had financial problems, and Ricketts tried a number of business ventures. Sharla became disgruntled with their circumstances, including their involvement in adult entertainment.

Several times, beginning in mid-December 1995, Ricketts discussed with his friend Green that he and Sharla were having marital difficulties. Ricketts told Green that he had secretly placed a recording device on their home telephone and that Sharla was having an affair with a man named "Sam." Ricketts and Sharla discussed her affair with "Sam," as well as separation. Green spoke with Ricketts after Christmas, and it was Green's understanding that Sharla had moved out of the couple's home and was staying with relatives until a decision about the marriage was made. In a subsequent conversation, Ricketts indicated to Green that he thought they were going to work things out. Ricketts continued the clandestine telephone recordings.

On January 4, 1996, Ricketts and Sharla spent the evening together. Earlier that day Ricketts had telephoned Sharla's mother and discussed the extramarital affair; he told the mother that he could not "control" Sharla. Ricketts admittedly was angry with Sharla. Ricketts brought his .380 caliber semi-automatic pistol into the house.

At 11:53 p.m. on January 4, 1996, a neighbor of the Rickettses heard gunshots and saw that the lights were on at the Rickettses' house. Around midnight Green received a telephone page from the Rickettses' home. He returned the page and Ricketts told him that he

---

[1] The shooting occurred January 4, 1996. On April 8, 1996, a Forsyth County grand jury indicted Gregory Ricketts for malice murder and for intercepting communications which invade the privacy of another. Ricketts was tried before a jury August 26-29, 1996, and was found guilty of both offenses. On August 29, 1996, Ricketts was sentenced to life imprisonment for malice murder and a concurrent three years in prison for intercepting communications which invade the privacy of another. A motion for new trial was filed on September 23, 1996, amended on March 26, 2001, and denied on April 23, 2002. A notice of appeal was filed on May 9, 2002, and the case was docketed in this Court on June 11, 2002. The appeal was orally argued on October 28, 2002.

had shot Sharla; Ricketts stated that "he could not go to prison and that he was a corpse." Green checked out of the hotel where he was staying, and telephoned the Rickettses' home again at about 1:30 a.m. Ricketts was at the home with his best friend whom Ricketts had telephoned right after the shooting. In the discussion, Green determined that the police had not been called. Green drove to the Rickettses' home, notifying the Forsyth County Sheriff's Office while he was on the way.

A detective with the Forsyth County Sheriff's Office was dispatched to the Rickettses' home about 2:00 a.m.; other officers were already there and Ricketts was in the back seat of a patrol car. Sharla's body was lying on the floor in the house, close to a dining table, with her head pointing toward a kitchen countertop. She had been shot five times and died as a result of multiple gunshot injuries. Some of the bullets entered Sharla as she was standing with her arms in front of her. One bullet entered her right arm, exited the other side, and reentered her chest. She was shot twice in the left arm. She also sustained a gunshot wound to the left side of the head; Sharla was shot while "the muzzle of the gun was against [her] head." The wounds to the arms and upper body would not have caused a loss of consciousness, but the shot to the left side of the head would have led to an immediate loss of consciousness. Two bullets were removed from Sharla's body during the autopsy.

A .380 caliber semi-automatic pistol was on the table in the Rickettses' dining room. An examination of the pistol revealed one round in the chamber and four in the magazine. There was an apparent bullet hole in the handset of the telephone located on the kitchen counter. Eight shell casings were located in the house. Four bullets were retrieved from the dining room wall. Based on the location of the casings, bullets, and bullet holes, it was determined that Ricketts walked toward Sharla, shooting as he passed the counter. The .380 caliber pistol found at the scene fired the bullets that were recovered from Sharla's body and also fired the projectiles retrieved at the scene. A pouch for a small pistol and a magazine for a .380 caliber pistol were found in the Rickettses' bedroom at the side of the bed. Ricketts routinely carried a Browning .380 caliber semi-automatic pistol, and stipulated to its ownership at trial.

At trial, Ricketts admitted shooting Sharla on the evening of January 4, 1996. He testified that he had made a romantic dinner for Sharla who arrived later that evening; the couple had sex and then Ricketts began trying to get Sharla to admit to her continued contact with "Sam"; when Sharla refused, Ricketts told her he knew about the voice mail contacts with "Sam" and that he knew the voice mail access code; Sharla "just started screaming" and "ranting"; she got out of bed and put on her clothes; she said derogatory things to Rick-

etts; Ricketts went into the bathroom and opened Sharla's travel bag; it was "full of business cards and condoms"; Ricketts asked Sharla why she had condoms in her bag, and she responded that it was none of his business, that she could have sex with whomever she wanted to, and that she was going to call "Sam"; Sharla "just walked away and grabbed the phone"; and "then she was dead." Ricketts claimed that he "didn't remember the screams . . . didn't remember the blood . . . didn't remember any of it."

A warranted search of the Rickettses' residence revealed the secreted recording device and the audiotapes of Sharla's telephone calls. Sharla was retrieving her voice mail messages when the shooting began. Consequently, the audiotape located inside the device not only recorded Sharla retrieving her messages but also the sounds of her exchange with Ricketts, the fatal shooting, and Ricketts's telephone call to his best friend telling him about the shooting. The audiotape was played for the jury.

1. The evidence was sufficient to enable a rational trier of fact to find Ricketts guilty beyond a reasonable doubt of the malice murder of his wife and intercepting communications which invade the privacy of another. *Jackson v. Virginia*, 443 U. S. 307 (99 SC 2781, 61 LE2d 560) (1979).

2. Ricketts contends that the trial court erred when it denied his motion to suppress the discovery, seizure, and admission into evidence of the audiotape recordings found at his home as they were not specifically mentioned in the obtained search warrant; therefore, the police made the warrant an impermissible general warrant in violation of Article I, Section I, Paragraph XIII of the Georgia Constitution, as well as the Fourth and Fourteenth Amendments to the United States Constitution. But that is not the case.

In the affidavit in support of the search warrant obtained on January 5, 1996, the affiant stated, inter alia, that Ricketts was under the impression that his wife was having an affair with another male, "possibly named Sam," and described, in pertinent part, the property sought to be seized as "any writings; cards, letters, photographs which indicate an extramarital affair. . . . Any answering tapes or other audio tapes which may indicate an extramarital affair or which had been taped by Defendant of victim['s] calls." The warrant authorizing the search also specifies certain described property including, "answering machine tapes" and "audio tapes." Thus, the seized audiotapes were described with sufficient particularity. *Lawler v. State*, 276 Ga. 229 (576 SE2d 841) (2003); see also *Schwindler v. State*, 254 Ga. App. 579, 582 (1) (563 SE2d 154) (2002).[2]

---

[2] Although not enumerated as error, in argument Ricketts complains that the police lis-

3. There is no merit to Ricketts's contention that venue was not pled in the indictment. "The true test of the sufficiency of an indictment is not whether it could be made more certain and definite, but whether it contains the elements of the offense charged, apprises the accused of what he must be prepared to defend against, and protects against double jeopardy." *Arthur v. State,* 275 Ga. 790, 791 (2) (573 SE2d 44) (2002).

The heading of the indictment in this case read, in large, bold type: "**GEORGIA, FORSYTH COUNTY.**" Then each count of the indictment charged and accused Ricketts of committing the alleged offense "in the County aforesaid." The indictment sufficiently informed Ricketts that he must be prepared to defend against allegations that he committed the charged crimes in Forsyth County.

4. Ricketts contends that the trial court committed reversible error by limiting his closing argument to only one hour instead of permitting his attorneys to argue for two hours as provided by OCGA § 17-8-73. However, the limitation of closing argument is not a basis for reversal in this case.

At trial, Ricketts was represented by three attorneys. The trial court allowed Ricketts's defense team and the prosecution an hour each for closing argument. There was no objection to the one-hour time frame by Ricketts's attorneys, nor did they request any additional time. In 1996, when Ricketts's trial was held,

> Uniform Superior Court Rule 13.1 limited closing argument in a "capital felony case in which the death penalty is sought" to two hours and to one hour in "any other felony case," and OCGA § 17-8-73 provided that counsel in a noncapital felony case was limited to one hour for closing argument, and to two hours in a capital felony case.

*Monroe v. State,* 272 Ga. 201, 202 (2) (528 SE2d 504) (2000).

Approximately 16 months after Ricketts's trial, this Court decided *Hayes v. State,* 268 Ga. 809 (493 SE2d 169) (1997). In *Hayes,* this Court determined that "capital felony" as used in OCGA § 17-8-73 encompassed those murder cases in which the death penalty was not being sought, and consequently, that in such cases there is a two-hour time limit for the defendant's closing argument. Id. at 813 (7); *Monroe v. State,* supra at 202 (2). This Court recognized that

> [t]he right to make a closing argument to the jury is an important one, and abridgment of this right is not to be tol-

---

tened to the audiotapes without applying for a second search warrant, but he fails to provide any authority for the proposition that they were required to do so.

erated. Harm, requiring that a defendant be given a new trial, is presumed when the right is erroneously denied, and the presumption of harm, although not absolute, is not readily overcome.

*Hayes v. State*, supra at 813 (7). However, this presumption of harm will not stand when the denial of the right is not complete and when the evidence of a defendant's guilt is overwhelming so as to render any other version of events virtually without belief. Id. See *Monroe v. State*, supra.

Clearly, in this case, Ricketts's right to make a closing argument was not completely abridged. Ricketts did not deny that he killed his wife. His sole defense was that the shooting was an act of voluntary manslaughter precipitated by his wife's flaunting of an adulterous relationship. Two of his three attorneys decided to argue, and they had an hour to urge the jury that their client acted out of a sudden, violent, and irresistible passion at the time he fired the fatal shots. See *Monroe v. State*, supra.

But the evidence was overwhelming that the killing was not a case of sudden, violent, and irresistible passion, but was done with malice. By his own admission, Ricketts knew about his wife's affair for at least a month before the killing. He knew "Sam's" address and telephone number. He also knew that the affair was ongoing because of his secret recordings as well as his observation of his wife's behavior, which sometimes included her staying out all night. He admitted that he was angry with his wife, and just hours before the killing lamented that he could not "control" her. He brought his handgun into the house. On the night of the murder, by his own admission, he pressed his wife to discuss her relationship with "Sam," even though she did not wish to do so.

The physical evidence was also compelling on the question of malice; the final fatal shot was fired at point blank range into the side of the head. Following the shooting, Ricketts failed to summon medical assistance or to notify authorities. He tried to prevent the recording device from being found. Even though he claimed that he spent the time contemplating suicide, discussing it with others, and attempting to put his affairs in order, he expressed his concerns about going to prison. Finally, the jury had before it the telling evidence of the audio recording of events leading up to, during, and following the shooting.

This evidence rendered Ricketts's story that he acted out of the heat of passion virtually without belief. Accordingly, this is a case in which the presumption of harm has been overcome. See *Monroe v. State,* supra; *Hayes v. State*, supra.

5. Ricketts does not show that his trial counsel was ineffective

because of the failure to object to the one-hour limitation on closing argument.[3]

In order to demonstrate ineffectiveness of trial counsel, Ricketts must show that counsel's performance was deficient and that the deficiency prejudiced him such that a reasonable probability exists that, but for the attorney's errors, there would have been a different outcome at trial. *Butler v. State*, 273 Ga. 380, 384 (10) (541 SE2d 653) (2001); *Strickland v. Washington*, 466 U. S. 668 (104 SC 2052, 80 LE2d 674) (1984). This he does not do.

First, it should again be noted that Ricketts's trial was before this Court's determination in *Hayes v. State*, supra, that a defendant in a non-death penalty murder case is entitled to two hours of closing argument. See Division 4, supra. Second, Ricketts's lead counsel, Cannon, an experienced criminal defense attorney, testified that the "case was murder or manslaughter," and that he had sufficient time to make his closing argument and saw no reason to ask for additional time because he felt that "you start to lose the jurors even on the hour. . . ."[4] Thus, lead defense counsel's failure to object to the one-hour time limitation or to request additional time can be deemed reasonable trial strategy. *Milner v. State*, 271 Ga. 578, 579 (2) (522 SE2d 654) (1999). But even assuming arguendo, that counsel was deficient for failing to challenge the one-hour limitation, there was no prejudice or harm to Ricketts. See Division 4, supra.

6. Ricketts contends that the trial court erred when it charged the jury that: "to kill either a spouse or the spouse's lover for past acts of adultery or to prevent the apparent commission or the completion of an act of adultery in progress between them, nothing else appearing, is murder." He argues that the instruction had a chilling effect on his defense that he was guilty of voluntary manslaughter because he acted under a violent, sudden impulse of passion due to his wife's adultery. But the argument is unavailing.

The charge is from the suggested pattern jury instructions. See Suggested Pattern Jury Instructions, Vol. II: Criminal Cases (2nd ed.), Part 4 (B) (3), p. 71 (2001). Moreover, the instruction states that the killing for past acts of adultery or to prevent adultery in progress is murder when there is "nothing else appearing." It leaves the door

---

[3] As noted, Ricketts was represented at trial by three attorneys; however, his claim of ineffectiveness of trial counsel is focused on his lead counsel's acceptance of the time limitation.

[4] In regard to Ricketts's motion for new trial, as amended, the parties stipulated testimony from the assistant defense counsel who shared closing argument with lead counsel to the effect that an additional hour was necessary for assistant counsel to "properly deliver her part of the closing argument." Ricketts relies in part on this testimony; however, its relevance is questionable inasmuch as the ineffectiveness claim is focused on lead counsel's actions.

open for the jury to consider whether such killing was committed in circumstances which would constitute voluntary manslaughter. Most significantly, the instruction must be considered in the context of the court's charge as a whole.[5] *Shadron v. State*, 275 Ga. 767, 771 (5) (573 SE2d 73) (2002). When the instruction is considered in the context of the totality of the court's charge, it is plain that the instruction in no way misled the jury or hindered Ricketts's ability to put forth a defense of voluntary manslaughter.

7. The jurors, during deliberation, wrote a note to the trial court requesting to see the victim's driver's license, and to have a tape player sent out to them so that they could rehear the audiotape excerpt that was played for them during trial. The trial court stated to defense counsel and the prosecution that it proposed to have the foreperson come in, and it would then instruct him that the jury would be provided with the victim's driver's license; that the request for a tape player to be sent out to the jury could not be granted because the court was not permitted to do that; and that if the jury wanted to request that the audiotape be played, then the court would consider that request, but that the replay would have to be done in the courtroom. Counsel for both sides agreed with the court's proposed action, and the foreperson was brought into the courtroom and

---

[5] The trial court also charged:

To constitute murder, the homicide must have been committed with malice. Legal malice is not necessarily ill will or hatred, but it is the unlawful intention to kill without justification, excuse or mitigation.
* * *
Ladies and gentlemen, after consideration of all the evidence, before you would be authorized to return a verdict of malice or felony murder, you must first determine whether mitigating evidence, if any, would cause the offense to be reduced to voluntary manslaughter.
In that regard, I charge you to kill either a spouse or the spouse's lover for past acts of adultery or to prevent the apparent commission or the completion of an act of adultery in progress between them, nothing else appearing, is murder.
Any killing in a spirit of revenge for a past completed wrong, however heinous cannot be justified.
However, if shown by the evidence that the killing was done by the Defendant without malice and not in the spirit of revenge but under a violent, sudden impulse of passion created in the mind of a person by the circumstances surrounding the transaction, you would be authorized to consider whether or not the Defendant is guilty of voluntary manslaughter as I will define.
Ladies and gentlemen, a person commits voluntary manslaughter when that person causes the death of another human being under circumstances which would otherwise be murder if that person acts solely as the result of a sudden, violent and irresistible passion, resulting from serious provocation, sufficient to excite such passion in a reasonable person.
* * *
In that connection, I charge you the burden of proof is upon the State to prove beyond a reasonable doubt that the offense is not so mitigated.
What circumstances will present a situation so as to excite such passion and exclude all idea of deliberation or malice is a matter for the jury to determine.

so instructed. The foreperson was asked to relay this to his fellow jurors and also told that if the jurors had any additional requests to give them to the bailiff. There was no objection whatsoever from the State or defense counsel. The jury requested that the audiotape be played in the courtroom with no disruptions.[6] And the audiotape was played for the jury.

(a) Ricketts contends that he was not present during the exchange among the trial court, his defense counsel, counsel for the prosecution, and the jury foreperson, and therefore, he was not present at a critical stage of his trial. However, Ricketts has failed to demonstrate that he was in fact absent during the colloquy.[7] The trial record is silent on the question. The trial court found as fact that it did not recall that Ricketts was absent for any of the proceedings.[8] Lead defense counsel testified that he had no independent recollection of whether Ricketts was present, and co-counsel stipulated that she had "no memory, whatsoever" whether Ricketts was in court at the time. The only indication that Ricketts was not present was his own testimony at the hearing on his motion for new trial. Therefore, Ricketts has not shown that the trial court's fact findings are clearly erroneous. See *Cromartie v. State*, 270 Ga. 780, 790 (24) (514 SE2d 205) (1999). Moreover, even if Ricketts was absent during the colloquy, the defense did not voice an objection in that regard during the remainder of the trial. See *Kennedy v. State*, 274 Ga. 396, 397 (3) (554 SE2d 178) (2001). A trial court has the discretion to allow a jury to rehear evidence, and there is no indication that the nature of the communication in this case hastened the verdicts against Ricketts or caused the jurors to yield their convictions. *Burtts v. State*, 269 Ga. 402, 403 (3) (499 SE2d 326) (1998). Compare *Pennie v. State*, 271 Ga. 419, 420 (2) (520 SE2d 448) (1999).

(b) There is likewise no merit to Ricketts's further contention that his convictions must be reversed because the trial court's initial exchange with only the jury foreperson, and not the remaining 11 jurors, violated his constitutional right to a trial by a 12-person jury. Here again, there was no objection to this procedure by the defense. Moreover, the court has "the inherent power adequately to control, in

---

[6] Apparently, there was a disruption involving family members when the audiotape was earlier played for the jury.

[7] There is no contention or dispute that Ricketts was present in the courtroom for the replaying of the audiotape for the jury.

[8] In its order denying Ricketts a new trial, the trial court stated in pertinent part: The record is silent as to the Defendant's presence in Court for the Court's colloquy with the jury foreperson and counsel for both sides concerning the jury's request to rehear a tape recording during deliberations. . . . The Defendant was present for the replaying of the recording for the jury. The Court notes that it is vigilant as to whether a defendant is present in Court for all stages of a trial and does not recall that Defendant was ever absent for any of the proceedings.

the furtherance of justice, officers, parties, jurors, witnesses, and others connected with a pending case." *Johnson v. State*, 177 Ga. 881, 882 (a) (171 SE 699) (1933). What is more, Ricketts cannot show any harm from the court's action. The evidence at issue was presented to all the jurors at the same time, and Ricketts's fate was decided by the full jury.

*Judgments affirmed. All the Justices concur, except Fletcher, C. J., and Sears, P. J., who concur specially, and Carley, J., who concurs and also concurs specially.*

FLETCHER, Chief Justice, concurring specially.

I join the majority's affirmance of Ricketts's conviction for the murder of his wife, but write separately because the jury instruction on adultery in murder cases needs to be replaced.

1. I cannot join the majority's approval of the following jury charge:

> . . . I charge you to kill either a spouse or a spouse's lover for past acts of adultery or to prevent the apparent commission or the completion of an act of adultery in progress between them, nothing else appearing, is murder.[9]

This statement fails to fully apprise the jury of the law of this State that adulterous conduct can serve as sufficient provocation to reduce homicide from murder to voluntary manslaughter.[10] This jury charge relies upon a vague statement "nothing else appearing" to substitute for the principle that a jury may convict on the lesser offense of manslaughter if it finds that the defendant acted solely as the result of a serious provocation that excites a sudden, violent, and irresistible passion.[11]

This charge also reveals the dangers of lifting jury instructions from appellate opinions.[12] This charge comes from this Court's decision in *Burger v. State*,[13] in which we stated,

> the idea that a spouse is ever justified in taking the life of another . . . to prevent adultery is uncivilized. This is murder; and henceforth, nothing more appearing, an instruction

---

[9] Suggested Pattern Jury Instructions, Criminal Cases (2nd ed.), Charge 4 (B) (3).

[10] *Goforth v. State*, 271 Ga. 700 (523 SE2d 868) (1999); *Strickland v. State*, 257 Ga. 230, 231 (357 SE2d 85) (1987).

[11] OCGA § 16-5-2 (a).

[12] See *Stull v. State*, 230 Ga. 99, 104 (196 SE2d 7) (1973) ("Even though language used by the appellate courts in a decision may embody sound law, it is not always appropriate to employ such language in instructing the jury.").

[13] 238 Ga. 171, 172 (231 SE2d 769) (1977).

on justifiable homicide may not be given.[14]

The Court's primary emphasis in *Burger* was to address and overturn prior law that held that killing a spouse's lover to prevent adultery constituted justifiable homicide. Thus, the Court advised judges and attorneys not to use a justifiable homicide defense in these circumstances.[15] The Court did not intend to foreclose a jury's consideration of the contention that finding one's spouse in an adulterous situation created provocation within the meaning of the voluntary manslaughter statute. The Court specifically stated,

> Our ruling should not, however, be read to mean that the peculiar facts of a given case may never suggest "passion" and "provocation" within the meaning of the voluntary manslaughter statute.[16]

In future prosecutions involving a defense of voluntary manslaughter because of adulterous conduct, I would urge trial courts not to give the above-quoted portion of charge 4 (B) (3). Instead, a clearer statement of the law would be to first define voluntary manslaughter, and then to charge as follows:

> A spouse's adulterous conduct may serve as serious provocation sufficient to cause a person to act as the result of a sudden, violent, and irresistible passion. What circumstances will present a situation so as to excite such passion and exclude all idea of deliberation or malice is a matter for the jury to determine. If the evidence shows, beyond a reasonable doubt, that the killing was done by the defendant without malice, and without a spirit of revenge, but under a violent, sudden impulse of passion, then you would be authorized to find the defendant guilty of voluntary manslaughter.

Nevertheless, I conclude that no reversible error occurred under the unique facts of this case.

2. Additionally, I cannot join Division 4 of the majority opinion. The defendant did not object at trial to the time limitation imposed on closing arguments and did not request additional time. The majority, however, ignores the defendant's failure to preserve this error for appeal. In the two leading cases dealing with this issue, the defend-

---

[14] Id.
[15] See also *Gibbs v. State*, 174 Ga. App. 19 (329 SE2d 224) (1985) (Carley, J.) (criticizing use of other language from *Burger* as a jury charge).
[16] *Burger*, 238 Ga. at 172.

ants objected to the time limitation on closing argument.[17] By addressing the merits of the issue on appeal, the majority fails to employ the time-honored rule that a failure to object at trial waives the issue on appeal.[18] This Court has routinely applied this rule to a wide variety of alleged errors,[19] including the failure to allow the defendant his right under OCGA § 17-8-71 to the opening and closing arguments.[20] The Court has relaxed the rule only in cases involving the death penalty.[21] I would hold, consistent with our prior cases, that because Ricketts failed to raise at trial any objection to the time limitation, he has waived the issue on appeal.

I am authorized to state that Presiding Justice Sears joins in this special concurrence and Justice Carley joins in Division 1 of this special concurrence.

DECIDED MARCH 24, 2003 —
RECONSIDERATION DENIED APRIL 11, 2003.

*Brian Steel*, for appellant.
*Philip C. Smith, District Attorney, Penny A. Penn, Assistant District Attorney, Thurbert E. Baker, Attorney General, Jennifer S. Gill, Assistant Attorney General*, for appellee.

---

[17] *Monroe v. State*, 272 Ga. 201 (2) (528 SE2d 504) (2000); *Hayes v. State*, 268 Ga. 809 (493 SE2d 169) (1997).

[18] *State v. Larocque*, 268 Ga. 352, 353 (489 SE2d 806) (1997) ("State has long followed the contemporaneous objection rule, which provides that counsel must make a proper objection on the record at the earliest possible time to preserve for review the point of error."); *Earnest v. State*, 262 Ga. 494, 495 (422 SE2d 188) (1992) (alleged errors not raised at trial will not be heard on appeal).

[19] See, e.g., *Braley v. State*, 276 Ga. 47, 50 (572 SE2d 583) (2002) (failed to object to presence of court personnel in courtroom during ex parte hearings); *Sedlak v. State*, 275 Ga. 746, 754 (571 SE2d 721) (2002) (failure to object to question rephrased after initial objection); *Acliese v. State*, 274 Ga. 19, 20 (549 SE2d 78) (2001) (failure to object to admission of exhibit); *Rhode v. State*, 274 Ga. 377, 380 (552 SE2d 855) (2001) (failure to object to trial court's excusal of juror); *Massey v. State*, 272 Ga. 50, 52 (525 SE2d 694) (2000) (failure to object to trial court's admonishment to defense counsel not to read the law); *Lyons v. State*, 271 Ga. 639, 641 (522 SE2d 225) (1999) (failure to object to improper responses by a prospective juror); *Palmer v. State*, 271 Ga. 234, 238 (517 SE2d 502) (1999) (failure to object to judge's lack of impartiality); *Miller v. State*, 267 Ga. 92 (475 SE2d 610) (1996) (failure to object to improper comments made in closing argument); *Hood v. State*, 266 Ga. 662, 663 (470 SE2d 235) (1996) (failure to object to witness testifying after violating rule of sequestration); *McIntyre v. State*, 266 Ga. 7, 20, n. 36 (463 SE2d 476) (1995) (failure to object to substitution of judge); *Lee v. State*, 265 Ga. 112, 114 (454 SE2d 761) (1995) (failure to object to form of verdict).

[20] *Scott v. State*, 243 Ga. 233, 234-235 (253 SE2d 698) (1979) (construing former Code Ann. § 27-2201).

[21] *Gissendaner v. State*, 272 Ga. 704, 713 (532 SE2d 677) (2000) (failure to make objection waives issue of improper argument at guilt-innocence phase of death penalty trial).