318 Ga. 769
FINAL COPY

S24A0125. STRYKER v. THE STATE.

COLVIN, Justice.

Appellant Austin Stryker appeals his convictions for malice

murder and other crimes related to the shooting and stabbing death

of Hannah Bender.[1] On appeal, Appellant contends that the trial

---

[1] Bender died on September 15, 2019. On December 18, 2019, a Dawson County grand jury indicted Appellant and co-defendants Isaac Huff, Dylan Reid, and Jerry Harper in connection with Bender's death. Huff and Reid each entered negotiated guilty pleas in exchange for their testimony at Appellant's trial. On July 27, 2021, the grand jury reindicted Appellant and co-defendant Harper in a 29-count indictment related to Bender's death, which charged Appellant in Counts 1-24 and Harper in Counts 25-29. Appellant was charged with malice murder (Count 1), three counts of felony murder (Counts 2-4), three counts of aggravated assault (Counts 5-7), two counts of aggravated battery (Counts 8 and 9), possession of a firearm during the commission of a felony (Count 10), possession of a knife during the commission of a felony (Count 10), 11 counts of violating the Street Gang Terrorism and Prevention Act (Counts 12-22), concealing the death of another (Count 23), and tampering with evidence (Count 24).

Appellant was tried before a jury without Harper from November 1 through 9, 2021, and the jury returned verdicts of guilty as to all counts. On December 15, 2021, the trial court sentenced Appellant to life in prison without the possibility of parole for malice murder (Count 1) and consecutive sentences of 20 years in prison for aggravated battery (Count 9), a total of ten years in prison for possession of a firearm and knife during the commission of a felony (Counts 10 and 11), and ten years in prison for concealing the death of another (Count 23). The court imposed concurrent sentences of 20 years in prison for aggravated assault (Count 7), 20 years in prison for each count of violating the

court violated his constitutional right to present a complete defense when it prevented defense counsel from making a closing argument that co-defendants Isaac Huff and Dylan Reid would have faced minimum sentences of life in prison had they not pled guilty. Appellant also contends that the prosecutor personally attacked defense counsel in closing argument and that the trial court abused its discretion in overruling his objection to those personal attacks. Finally, Appellant argues that the trial court erred in failing to charge the jury on "grave suspicion" after, as he contends, the prosecutor misconstrued the beyond-a-reasonable-doubt standard in closing arguments. Although we conclude that Appellant's claims

Street Gang Terrorism and Prevention Act (Counts 12-22), and ten years in prison for tampering with evidence (Count 24). The remaining aggravated-assault charges (Counts 5 and 6) and aggravated-battery charge (Count 8) were merged for sentencing purposes. And although the court purported to merge the felony-murder counts (Counts 2-4) with malice murder for purposes of sentencing, those counts were actually vacated by operation of law. See *Malcolm v. State*, 263 Ga. 369, 371-372 (4) (434 SE2d 479) (1993).

Appellant timely filed a motion for new trial on January 12, 2022, and amended the motion on February 28, 2023. Following a hearing on March 14, 2023, the trial court denied the motion for new trial, as amended, on June 30, 2023. Appellant timely filed a notice of appeal directed to this Court on July 12, 2023. The case was docketed in this Court to the term beginning in December 2023 and submitted for a decision on the briefs.

fail, we have identified merger errors in Appellant's sentencing that require correction. Accordingly, we affirm in part and vacate in part the judgment below.

1. The evidence presented at trial showed the following. Appellant was a member of a small gang called "THIS," alongside Jerry Harper, Jeremiah Wazar, Dylan Reid, Isaac Huff, and Damien Edge. Bailey Williams was also associated with "THIS," although she was not an official member, and Bender was Williams's friend. Huff and Reid testified that the gang sold drugs and committed robberies, including armed robberies of two stores in the months leading up to Bender's death. Huff and Williams admitted that they helped Appellant commit an armed robbery of a store in Dahlonega. Huff also testified that Appellant told him about an armed robbery Appellant and Edge committed in Dawsonville.

Reid testified that, prior to the date of Bender's death, Appellant mentioned that he suspected Bender was "snitch[ing]" about the armed robberies committed by the gang and that he wanted to "[g]et rid of her." Then, in the early hours of September 5,

3

2019, while Appellant, Huff, and Reid were hanging out in Huff's basement drinking "[a] little alcohol" and using "[a] little drugs," their conversation turned again to Bender. Reid testified that Appellant made another statement about getting rid of Bender. And Huff testified that the men talked about how they were going to "prove to everybody" that they were "not a joke" by "roughing [Bender] up a little bit or something like that."

Reid testified that Appellant then asked Reid to send a message to Williams telling her that Appellant and Huff were on their way to her house. Reid, who stayed behind, testified that, on the way out of Huff's residence, Appellant decided to take a pistol Appellant had gotten from a man named Robert Youngblood, saying, "You never know. I might need it." Huff testified that he then drove Appellant in a Mazda truck to a gas station and then to Williams's home. Huff said that he waited in the truck while Appellant talked to Williams inside her home. Williams said that, during this visit, Appellant asked her to message Bender and told Williams he "had a problem that he needed to deal with."

4

Huff drove Appellant to Bender's house, and Appellant went inside. According to Huff, Appellant planned to convince Bender to come with them by telling her that they were taking her on a trip to Florida. And when Bender came out to the truck with Appellant, she was carrying a duffle bag.

Appellant and Bender sat across from each other in the "two fold-out seats" behind the driver and passenger seats of the truck. According to Huff, after they stopped at a gas station to purchase gas and cigarettes, they drove to Appellant's house because, as Huff later learned, Appellant suspected that the gas station cameras had recorded the clothes he had been wearing and he wanted to change clothes. Huff testified that, while Appellant was inside changing, Bender talked about how excited she was to visit Florida.

Appellant returned to the truck, and they started driving to Huff's residence. Huff testified that a few minutes into the drive, Appellant told Huff to "slow down," so Huff "dropped gears in the truck." "[S]hortly after that," Huff testified, he "heard a shot go off in the back of the truck," and then Appellant "climb[ed] into the

front seat" and "told [Huff] to drive faster, to go now, get out of there."

Huff testified that he heard "a gurgling-type noise" coming from Bender after the shooting, and when they arrived at Huff's house, Huff saw that Bender was slumped over in the back seat in a pool of blood. Huff then went into the house, woke up Reid, and told Reid to go outside.

Reid testified that he walked outside, finding Appellant shirtless and wiping Reid's knife on the ground. Appellant instructed Reid to grab a trash bag and a blanket from inside the house, which he did. Appellant then instructed Reid to help him get Bender's body out of the truck. Reid testified that he and Appellant put a trash bag over Bender's head, pulled her out of the truck, wrapped her in a blanket, and threw her body in a nearby firepit. According to Huff, Appellant told him not to let anyone walk near the firepit, and Reid recalled Appellant telling Huff "to keep an eye on her [be]cause she may still be alive." Appellant and Reid then drove the Mazda to Appellant's house, where they retrieved

6

Appellant's Ford Explorer.

Huff testified that when Appellant and Reid returned to Huff's house, Appellant told Huff that they were going to get rid of all the evidence. Reid said that he and Appellant then drove the Ford to Williams's house, where, according to Williams, Appellant told her she needed to go with them. Williams testified that they drove the Ford to Appellant's house, where Appellant got into the Mazda with Reid, and that Appellant asked Williams to follow them in the Ford and swerve if she saw any cops to distract them.

Shortly after leaving Appellant's house, Appellant stopped the car and told Reid to switch places with Williams. Williams testified that, when she got into the truck, she smelled blood and saw blood "everywhere." After driving a while, they stopped at the end of a gravel road, and Appellant instructed Reid to return the Ford to Appellant's wife before she went to work, which he did.

Williams testified that she and Appellant then drove to a campground, where Appellant disposed of Bender's belongings. According to Williams, Appellant also unbolted the two front seats

7

of the truck at the campground but did not remove them because a park ranger was nearby. Later, they drove to Youngblood's property, where Harper's camper was located. According to Williams, Appellant talked about Bender during the drive, saying that he "shot her" and that, "when she didn't die right away[,] . . . he stabbed her." Williams further testified that Appellant said, "I had to do it, didn't I? A rat is a rat. I had to do it."

Youngblood testified that Appellant asked for help, and Youngblood agreed to drive Appellant. Appellant then directed Youngblood to a campground, where, according to Youngblood, Appellant got out to look for something. Youngblood testified that, at some point, Appellant talked to him about Bender, saying that he "thought that she was undercover" and had "stabbed her."

Appellant returned to Huff's house later to retrieve the body from the firepit. With Reid's help, Appellant moved Bender's body into a toolbox from the bed of the Mazda truck. Appellant's wife then drove the Ford to Huff's house, and they loaded the toolbox containing Bender's body into the vehicle. Appellant, Appellant's

8

wife, Appellant's baby, and Reid all drove in the Ford to Youngblood's property. They left the toolbox containing Bender's body by a camper, which the evidence showed belonged to Harper, and then stripped out parts of the Mazda. Reid said that they bagged up the Mazda parts and then drove them to another location, where they threw the parts off the side of a hill.

Later, Harper drove the Mazda to a local farmer's property with Appellant following him in the Ford. The farmer testified that Harper offered him the Mazda, and that he agreed to take it. According to the farmer, Harper and Appellant then went down to a creek on the property. The farmer believed that they were going down to the creek "to get some sand," but Reid testified that Appellant buried Bender's body there.

Appellant asked Huff and Reid to put dirt on Bender's body every few days to prevent it from being discovered. Appellant also separately asked Huff, Reid, and Williams to drive him out of the state, but they declined, and Harper ultimately drove Appellant to

9

West Virginia.[2]

Youngblood testified that he kept a loaded pistol on top of his refrigerator, that Appellant had taken the gun without Youngblood's knowledge or permission, and that the gun was unloaded when Appellant returned it. After hearing that Bender was missing and discovering bloodstained clothing in his laundry room, Youngblood called the police and turned over the clothing and his gun. Prompted by a news report, the farmer also contacted the police, and officers took possession of the Mazda truck.

Investigators discovered Bender's body buried in a shallow grave by the creek on the farmer's property on September 25, 2019. The medical examiner who performed Bender's autopsy testified that Bender's injuries consisted of a single gunshot wound to the head and 32 stab wounds to her head, neck, chest, abdomen, back, and arms. The medical examiner said that the bullet entered Bender's forehead at a downward angle, and he agreed that it was

---

[2] In October 2019, Appellant turned himself in and was extradited back to Georgia.

"extremely unlikely" that someone would accidentally shoot themselves in that manner. He also testified that he observed fractures of three ribs "consistent with having been caused by the stab wounds." The medical examiner determined that the cause of Bender's death was the gunshot wound, the stab wounds, or a combination of both.

A crime scene specialist examined the Mazda truck and found high-velocity blood spatter that was consistent with a gunshot to the head in the rear passenger side of the vehicle, as well as medium-velocity blood spatter in the truck that was consistent with castoff from a hand or weapon. DNA testing revealed that blood samples taken from the Mazda matched Bender's DNA profile, and that DNA samples taken from the inside and outside of a pair of jeans recovered from Youngblood's house matched Appellant's and Bender's DNA profiles, respectively.

A ballistics expert testified that, based on his analysis of bullet fragments recovered from the medical examiner and the firearm recovered from Youngblood, the bullet was fired from Youngblood's

gun. He also opined that, due to the gun's design, holding the gun improperly could make it "a lot more difficult to fire."

Testifying in his own defense at trial, Appellant confirmed many of the details testified to by other witnesses. Specifically, Appellant testified that he was a member of a gang called "THIS," that he committed an armed robbery in 2019 with Huff, Wazar, and Williams, and that he had smoked methamphetamine and drank alcohol while in Huff's basement with Huff and Reid in the early hours of September 15, 2019.

Diverging from Huff's and Reid's accounts, however, Appellant testified that he left Huff's house to go steal methamphetamine from a drug dealer known as "Cuz." Appellant testified that he and Huff drove to Williams's house because he thought Cuz might be there. After discovering that Cuz was not there and "smok[ing] a little dope," Appellant asked Williams to come with them, thinking that it would be easier to find Cuz if Williams was the one to contact him because "[p]eople who sell drugs like beautiful women." When Williams declined, Appellant decided to ask Bender for help instead

because Bender and Cuz had previously had "a romantic relationship for a long time," and Appellant knew that Bender "had a crush on [Appellant]." Appellant testified that he and Huff then went to Bender's house, where he went inside and told her that he "had the tools necessary to rob Cuz" and that they would go to Florida after robbing Cuz.

According to Appellant, as they were driving, Bender asked him if he had a gun. Appellant said that he responded by tapping his right pocket, and, when "[s]he looked at [him] kind of funny," he "pulled [the gun] out, dropped the clip really quick, trying to seem cool," and "handed it to her." Describing how Bender held the gun, Appellant said "[s]he ha[d] it in her left hand with her fingers back," her "index finger pointing up," "her thumb in the trigger guard," and the gun "pointed at her head," which Appellant said was "[c]ompletely opposite of how you would hold a gun." Appellant testified that he had told Huff to slow down because Huff was driving too fast, and that, when he saw the gun was pointed at Bender's head, he realized he had not cleared the chamber and tried

13

to say, "Hey." According to Appellant, he did not "remember a jerk in the vehicle," only that there "was the gunshot," and Bender "immediately slump[ed] over." Appellant said that he then picked up the gun, jumped in the front seat, "said a cuss word and told [Huff] to go. Hurry. Get to the house."

Appellant testified that, after arriving at Huff's house, he tried to remove Bender from the truck, but she was too heavy. He said that Bender did not show any signs of life and there was a knife in the passenger seat of the truck, so he stabbed her for a "[c]ouple of minutes," thinking "maybe [he] could make her weigh less" if he "drain[ed] the blood." Appellant also admitted that he tried to cover up Bender's death, testifying that he put her body in a firepit at Huff's house, disposed of her belongings at a campground, transported Bender's body in a toolbox, stripped out parts of the Mazda and disposed of them, attempted to get rid of the Mazda, and buried Bender's body. But he denied murdering Bender.

2. Appellant argues that the trial court violated his right under the United States Constitution to present a complete defense when

14

it prohibited him from making a closing argument about the specific sentences Huff and Reid avoided by pleading guilty. We conclude, however, that any error in limiting the scope of Appellant's closing argument was harmless.

At trial, Huff and Reid each testified about their plea deals. Huff testified that he had initially been charged with felony murder as an accomplice in the case and that he had pled guilty to the lesser offenses of aggravated assault, concealing a death, and violating the Street Gang Terrorism and Prevention Act in exchange for testifying at Appellant's trial and receiving a reduced sentence of 30 years with 12 to serve. He further testified that he understood felony murder carried a mandatory minimum sentence of life in prison, and that he was concerned that his plea deal could be revoked and he could receive a harsher sentence if he lied at trial. Reid similarly testified that he had initially been charged with felony murder in connection with the case and that he had pled guilty to aggravated assault, concealing the death of another, tampering with evidence, and violating the Street Gang Terrorism and Prevention Act in exchange

for testifying at Appellant's trial and receiving a sentence of 35 years with 15 to serve. On cross-examination, Reid agreed that "15 [years was] a hell of a lot better than life" and admitted that he felt like he was in a tough situation because prosecutors had met with him before trial, making it clear that, if he said anything different at trial than he had said during his plea colloquy, they would take steps to revoke his plea deal.

During closing arguments, defense counsel attempted to use a demonstrative, which defense counsel described as "a slide on the risks that [Huff and Reid] avoided, [the] sentence they avoided[,] by taking a plea deal."[3] But the court prohibited defense counsel from using the demonstrative or "talk[ing] about a minimum of life in prison" because it was concerned that, "by conveniently talking about what [sentences Huff and Reid] could have gotten, [counsel was improperly] talking about what [sentence Appellant could] get." The court ruled that defense counsel could argue only that Huff and Reid "were charged with felony murder, and it was reduced."

---

[3] The demonstrative is not in the record on appeal.

Defense counsel then argued to the jury that, although Huff was "one of the most reliable individuals here," Huff and Reid were noticeably "reluctant or hesitant" to testify, that Reid had admitted "he was in a tough spot," and that both men "had been charged with felony murder" but "bargained with the State" to "ple[a]d guilty to something that did not include the word 'murder'" so they could receive reduced sentences of 12 and 15 years in prison, respectively. Defense counsel further argued that the plea deals "may have shaped, colored, [or] influenced their testimony" and caused Huff and Reid to "fill[ ] in some gaps after the fact" because they were trying to make a deal with the State, which needed information that only Huff and Reid could provide, namely, "what happened to [Bender], what was the cause and manner of her death."

On appeal, Appellant argues that the limitation the trial court imposed on his closing argument violated his "federal constitutional right" to present a defense because he was unable to argue bias based on the fact that Huff and Reid avoided mandatory minimum sentences of life in prison by pleading guilty and testifying at

17

Appellant's trial.

The right to counsel guaranteed by the Sixth Amendment to the United States Constitution, which is "extended to a defendant in a state criminal prosecution through the Fourteenth Amendment," includes a "right of the defense to make a closing summary of the evidence to the trier of facts." *Herring v. New York*, 422 U. S. 853, 857, 860 (II) (95 SCt 2550, 45 LE2d 593) (1975). Cf. *Nevada v. Jackson*, 569 U. S. 505, 509 (II) (133 SCt 1990, 186 LE2d 62) (2013) ("The Constitution guarantees criminal defendants a meaningful opportunity to present a complete defense[.]" (citation and punctuation omitted)). That right is violated where a trial court "den[ies] absolutely the opportunity for any closing summation at all." *Herring*, 422 U. S. at 863 (II). But the United States Supreme Court has never held that a restriction on closing arguments falling short of a complete denial of an opportunity for closing summation violates the federal Constitution. See *Glebe v. Frost*, 574 U. S. 21, 23-24 (135 SCt 429, 190 LE2d 317) (2014) ("[a]ssuming for argument's sake that the trial court violated the Constitution" by

18

"restricti[ng]" the arguments defense counsel could present in closing (emphasis omitted)). And the Court has further clarified that trial courts "have broad discretion" and are "given great latitude in . . . limiting the scope of closing summations." *Herring*, 422 U. S. at 862 (II).

Assuming without deciding that the trial court violated Appellant's federal constitutional right to make a closing argument by preventing defense counsel from referencing the specific sentences that Huff and Reid avoided by pleading guilty, we conclude that any error was harmless. It is well established that "an error of constitutional magnitude, such as the denial of the Sixth Amendment right to counsel, can be harmless if the State can prove beyond a reasonable doubt that the error did not contribute to the verdict." *Muse v. State*, 316 Ga. 639, 657 (5) (c) (889 SE2d 885) (2023) (citation and punctuation omitted). See *Glebe*, 574 U. S. at 23-24 (holding that, "even assuming that [the U. S. Supreme Court's decision in] *Herring* established that *complete denial* of summation amounts to structural error, it did not clearly establish that the

19

*restriction* of summation also amounts to structural error," and noting that "*[m]ost* constitutional mistakes call for reversal only if the government cannot demonstrate harmlessness" (emphasis in original)). See also *State v. Frost*, 160 Wash. 2d 765, 782 (2) (161 P3d 361) (2007) (en banc) (holding that the standard for reviewing a trial court's erroneous limitation on the scope of defense counsel's closing argument was proof "beyond a reasonable doubt that any reasonable jury would have convicted [the defendant], even absent the trial court's limitation on counsel's argument" (citation and punctuation omitted)); *United States v. Real*, 45 Fed. Appx. 647, 650 (4) (9th Cir. 2002) (unpublished) (holding that "[t]he district court erred in disallowing [the defendant's] argument," which "was not misleading and was fairly raised by the evidence," but that the error "was harmless beyond a reasonable doubt").

Here, any error in limiting Appellant's closing argument was harmless beyond a reasonable doubt because Appellant's convictions were supported by overwhelming evidence that came not just from Huff and Reid, but from Appellant himself, as well as other sources.

20

Appellant admitted on the stand that he stabbed Bender and covered up her death by putting her body in a firepit, transporting her body in a toolbox, removing parts of the truck where she was shot, disposing of her belongings, getting rid of the truck, and ultimately burying her body. Thus, the only disputed issue at trial was whether Appellant shot Bender or Bender had instead accidentally shot herself.

The trial evidence overwhelmingly showed that Appellant, rather than Bender, fired the bullet that struck Bender, and that he did so with malice aforethought. Williams, who testified without the benefit of a negotiated plea deal, said that Appellant had admitted to her that he shot Bender and stabbed her when she did not immediately die because she was a "rat." And Youngblood similarly testified that Appellant had admitted to him that he stabbed Bender believing she was an undercover informant. Further, the medical examiner testified that the bullet's trajectory through Bender's head made it unlikely that the wound resulted from an accidental, self-inflicted gunshot. And the ballistics expert testified that improperly

21

holding the gun, as Appellant claimed Bender had done, could have made it even more difficult to fire the gun accidentally.

Thus, there was overwhelming evidence undermining Appellant's defense and proving his guilt. Cf. *Ricketts v. State*, 276 Ga. 466, 471 (4) (579 SE2d 205) (2003) (holding that an erroneous limitation on the appellant's closing argument was harmless because the "evidence rendered [the appellant's] story that he acted out of the heat of passion virtually without belief"). In addition to the overwhelming evidence of Appellant's guilt, the jury also heard testimony from Reid and Huff from which they could conclude that Reid and Huff received greatly reduced sentences by entering pleas to charges less than murder, and defense counsel was able to make that argument in closing, albeit without specifically arguing that Reid and Huff would have received minimum life sentences. And, as a result, any error in limiting the scope of defense counsel's closing argument "was harmless beyond a reasonable doubt." *Muse*, 316 Ga. at 657 (5) (c).

Appellant argues for a different result based on *Palma v. State*,

22

280 Ga. 108 (624 SE2d 137) (2005). In that case, we concluded that the trial court had erroneously prevented defense counsel from "pointing out to the jury in argument the extent of the benefit th[at] witnesses received from agreeing to testify against [the defendant]" based on evidence introduced at trial about "the specific punishment the witnesses received and the potential punishments they avoided by agreeing to testify." Id. at 110 (2). And we concluded that the appellant was entitled to a new trial. See id.

But Appellant's reliance on *Palma* is misplaced. First, *Palma* did not address a criminal defendant's *constitutional* right to make a closing argument. Rather, we concluded in *Palma* that the trial court's ruling had deprived the appellant of a right recognized in our *decisional law* "to argue all reasonable inferences arising from the evidence presented in the trial." *Palma*, 280 Ga. at 110 (2) (citation and punctuation omitted). Second, in resolving the appellant's claim, *Palma* applied a standard of review derived from our precedent concerning violations of a criminal defendant's *statutory* right to make a closing argument of a particular duration. See id.

23

("A presumption of harm requiring the grant of a new trial accompanies the abridgement of the right to make a closing argument, and that presumption is overcome 'when the denial of the right is not complete and only in those extreme cases in which the evidence of a defendant's guilt is so overwhelming that it renders any other version of events virtually without belief.'" (quoting *Hendricks v. State*, 277 Ga. 61, 63 (3) (586 SE2d 317) (2003))). See, e.g., *Hendricks*, 277 Ga. at 63 (3) (addressing an alleged violation of OCGA § 17-8-73, which governs the duration of closing arguments in criminal cases); *Hayes v. State*, 268 Ga. 809, 813 (7) (493 SE2d 169) (1997) (same). And we have previously indicated that cases addressing violations of "the *statutory* requirement that counsel be given [a certain amount of time] for closing argument . . . do not" supply the standard for assessing a claimed violation of a *constitutional* right to present a closing argument. *Knighton v. State*, 310 Ga. 586, 595-596 (2) (b) & n.8 (853 SE2d 89) (2020) (emphasis supplied) (addressing a claimed violation of the defendant's constitutional right to a fair trial based on interruptions

24

that allegedly prevented defense counsel "from making a full closing argument"). Finally, *Palma* is distinguishable because there we concluded that the trial court's error was *not* harmless because the evidence of guilt was *not* "overwhelming." *Palma*, 280 Ga. at 110 (2). Here, by contrast, overwhelming evidence established Appellant's guilt. Accordingly, this claim fails.

3. Appellant argues that the trial court abused its discretion in overruling his objection that the prosecutor personally attacked defense counsel during closing arguments. We discern no abuse of discretion.

As an initial matter, Appellant did not make contemporaneous objections to most of the prosecutor's statements that he now challenges on appeal, so his challenges to those statements are not preserved for appellate review. See *Moon v. State*, 311 Ga. 421, 426 (4) (858 SE2d 18) (2021) (noting that "we do not review unpreserved challenges to closing arguments in non-death penalty cases, even for plain error"); *Chapa v. State*, 288 Ga. 505, 506 (2) (705 SE2d 646) (2011) (holding that the appellant's argument that the prosecutor

made an improper closing argument "ha[d] not been preserved for appeal because appellant failed to object to the prosecutor's closing argument at the time").

Appellant raised only one objection during closing arguments related to this enumeration of error. Specifically, Appellant objected that the prosecutor had made an improper "personal attack" after the prosecutor said that "the defense's argument" was "[a]s reasonable as saying that aliens came down and shot Hannah Bender," that the argument "d[id not] compute with common sense," and that "they are insulting your intelligence[,] [t]hey're insulting the whole process, and they're insulting and disrespecting Hannah Bender's memory." Following Appellant's objection, the prosecutor offered to move on, and the court did not rule on the objection. Then, after the court charged the jury, Appellant asked for a ruling on his objection to the prosecutor's statements.[4] The court overruled the

---

[4] Although Appellant asked the trial court to give a "curative instruction of the sympathy charge," Appellant does not argue on appeal that the prosecutor made improper sympathy arguments in closing, so we do not address that issue.

objection, finding that the prosecutor's argument "didn't have anything to do with" defense counsel or "say you were somehow bad lawyers or had done something improper or unethical." In its order denying Appellant's motion for new trial, the court reached the same conclusion, finding that the prosecutor's argument was not in fact a personal attack but instead an attack on the defense's theory of the case.

Assuming without deciding that Appellant's objection that the prosecutor personally attacked defense counsel in closing arguments is adequately preserved for appellate review, even though defense counsel did not obtain a ruling on the objection until after closing arguments concluded and the court had charged the jury, Appellant has not shown that the trial court abused its discretion in overruling the objection. Appellant argues that the prosecutor's argument was "essentially the same" as the one that the Court of Appeals concluded was improper and required a new trial in *Estep v. State*, 129 Ga. App. 909 (201 SE2d 809) (1973). But *Estep* is not analogous

27

to this case.[5] In *Estep*, the Court of Appeals concluded that the prosecutor had made improper "comment[s] that opposing counsel kn[ew] the defendant to be guilty [and] kn[ew] his client's case [was] not meritorious" when the prosecutor told the jury that defense counsel was "a good friend of mine" and that "he knows he doesn't have any merits on this case and he is just trying to confuse you." Id. at 915-916 (8) (punctuation omitted). Here, by contrast, the prosecutor did not indicate that he had a personal relationship with defense counsel or knew that defense counsel believed Appellant was guilty.

Further, the context surrounding the prosecutor's remarks supported the trial court's finding that the prosecutor was challenging the reasonableness of the defense theory, not, as Appellant contends, making an ad hominem attack on defense counsel. Specifically, in the objected-to portion of the prosecutor's argument, the prosecutor expressly said that it was "the defense's *argument*" that was unreasonable. (Emphasis supplied.) As a result,

---

[5] We express no opinion as to whether *Estep* was correctly decided.

the trial court reasonably interpreted the prosecutor's following remarks about the defense "insulting your intelligence," "insulting the whole process," and "insulting and disrespecting Hannah Bender's memory" as criticisms of the theory of the defense, not of defense counsel personally. See *Gissendaner v. State*, 272 Ga. 704, 713 (10) (a) (532 SE2d 677) (2000) (affirming the trial court's rejection of defense counsel's argument that the prosecutor made an improper "personal attack" during closing arguments where the prosecutor said that "[w]hat you just heard from defense counsel has done a tremendous violence to the truth in this case" and that defense counsel's argument was "an insult to the truth" (punctuation omitted)). Accordingly, this claim fails.

4. Appellant also argues that the trial court erred in failing to charge the jury on "grave suspicion" after, as Appellant claims, the prosecutor misconstrued the burden of proof in closing arguments. See Suggested Pattern Jury Instructions, Vol. II: Criminal Cases (2007), § 1.20.20 Grave Suspicion ("Facts and circumstances that merely place upon the defendant a grave suspicion of the crime

29

charged or that merely raise a speculation or conjecture of the defendant's guilt are not sufficient to authorize a conviction of the defendant."). This argument also fails.

In closing argument, defense counsel drew attention to the beyond-a-reasonable-doubt standard, explaining that there were three different standards of proof commonly used in the judicial system. Defense counsel said that the preponderance-of-the-evidence standard was "the lowest standard of proof"; "[t]he next level up from that is clear and convincing evidence," which is "a high threshold" that is "above preponderance" and "below proof beyond a reasonable doubt"; and "[h]igher than that is" proof beyond a reasonable doubt, which "does not mean proof to a mathematical certainty[,] . . . but it's close." Responding to defense counsel's statements about the standard of proof, the State argued:

> The judge is not going to tell you about clear and convincing evidence or preponderance or how reasonable doubt is higher than clear or lower than clear. That's not what the judge is going to tell you because that's not the law. . . . What you're going to get from the judge is reasonable doubt means just what it is. A reasonable doubt is a doubt based upon — once again I'm

highlighting these words — common sense and reason. It's that basic. It's that basic. You're not going to see a chart about clear and convincing, and it's higher than that. That's just inaccurate. . . . So the judge will tell you that reasonable doubt is a doubt based upon common sense and reason.

Appellant did not object to this statement. And following closing arguments, the court charged the jury on, among other things, the presumption of innocence, the State's burden to prove guilt beyond a reasonable doubt, and the definition of reasonable doubt as "doubt of a fair-minded, impartial juror honestly seeking the truth[,] . . . a doubt based upon common sense and reason."

Because Appellant did not object to the trial court's failure to give a "grave suspicion" charge following the court's charge to the jury, we review Appellant's claim only for plain error. See *Rountree v. State*, 316 Ga. 691, 693 (1) (889 SE2d 803) (2023) (noting that "objections at a charge conference do not suffice to preserve objections to the charge as subsequently given," and holding that the trial court's failure to give the defendant's requested jury instruction could be reviewed only for plain error because he "made no objection

31

when the trial court finished reading the charge to the jury" (citation and punctuation omitted)). To show that a trial court plainly erred in failing to give a jury instruction, "an appellant must show that (1) the alleged error was not affirmatively waived, (2) it was obvious beyond reasonable dispute, . . . (3) it affected the appellant's substantial rights," and (4) it "seriously affected the fairness, integrity or public reputation of judicial proceedings." *Willis v. State*, 315 Ga. 19, 26 (3) (b) (880 SE2d 158) (2022) (citations and punctuation omitted).

Appellant has not shown any error, much less plain error. When evaluating whether a trial court erred in failing to give a jury instruction, "we view the charge as a whole to determine whether the jury was fully and fairly instructed." *Clark v. State*, 315 Ga. 423, 440 (4) (883 SE2d 317) (2023) (citation and punctuation omitted). Here, a "grave suspicion" charge was unnecessary to fully and fairly instruct the jury because that charge was adequately covered by the charge as a whole, which included instructions on, among other things, the presumption of innocence, the State's burden to prove

guilt beyond a reasonable doubt, and the definition of reasonable doubt. See *Payne v. State*, 318 Ga. 249, 257 (4) (897 SE2d 809) (2024) (holding that the trial court did not err in failing to instruct the jury on grave suspicion because "the trial court's instructions on reasonable doubt, the presumption of innocence, mere presence, and mere association adequately covered the requested grave suspicion charge"); *Adkins v. State*, 314 Ga. 477, 483 (3) (887 SE2d 582) (2022) (holding that the trial court did not err in failing to instruct the jury on grave suspicion "because the concept was covered in other jury instructions," including instructions on reasonable doubt and the presumption of innocence). And even assuming that the prosecutor misconstrued the burden of proof, Appellant has not explained how a grave suspicion instruction would have resolved any confusion caused by the prosecutor's statements. Nor has he shown that the trial court's instructions, as given, were insufficient to resolve any such confusion. Accordingly, Appellant has not established plain error.

5. Although Appellant has not raised the issue on appeal, we

have identified two merger issues in his sentencing. See *Goodman v. State*, 313 Ga. 762, 770 (2) (c) (873 SE2d 150) (2022) (noting that "we often . . . exercise our discretion sua sponte to vacate a sentence for the benefit of defendants if we notice that it is void"); *Jackson v. Crickmar*, 311 Ga. 870, 873 (2) (860 SE2d 709) (2021) (noting that a sentence imposed on "a conviction that merges with another conviction is void" (citation and punctuation omitted)).

To authorize separate convictions for aggravated assault and malice murder of a single victim, or for aggravated battery and malice murder of a single victim, the trial evidence must show "that the defendant committed an aggravated assault [or aggravated battery] independent of the act that caused the victim's death." *Edwards v. State*, 301 Ga. 822, 828-829 (4) (a), (b) (804 SE2d 404) (2017). This requires evidence not only that there was a "deliberate interval" between the infliction of two separate wounds but also that one of the wounds was "fatal" while the other was "non-fatal." *Willis v. State*, 304 Ga. 686, 692 (2) (820 SE2d 640) (2018) (citation, punctuation and emphasis omitted).

The record reflects that Appellant was charged with committing malice murder "by shooting [Bender] and by stabbing [Bender]" (Count 1), committing aggravated assault "by shooting [Bender] and by stabbing [Bender]" (Count 7), and committing aggravated battery "by seriously disfiguring [Bender's] body by stabbing [Bender]" (Count 9). The trial court did not merge for sentencing purposes Counts 7 and 9 with Count 1 but rather imposed a 20-year concurrent sentence for Count 7 and a 20-year consecutive sentence for Count 9. This was error.

Although the trial evidence showed that there was a "deliberate interval" between Appellant shooting Bender and Appellant subsequently stabbing her, the evidence did not support a finding that any shooting or stabbing wounds inflicted on Bender before she died were "non-fatal." *Willis*, 304 Ga. at 692 (2) (citation, punctuation and emphasis omitted). To the contrary, the evidence showed that any shooting or stabbing wounds Bender sustained before she died were fatal. Specifically, the medical examiner testified that the "cause of death" was the "gunshot wound to the

35

head and stab wounds," as Bender had died from "either the gunshot wound or the stab wounds or some combination of those." Because the trial evidence failed to show "that the defendant committed an aggravated assault [or aggravated battery] independent of the act that caused the victim's death," the trial court erred in failing to merge for sentencing purposes Counts 7 and 9 with Count 1. *Edwards*, 301 Ga. at 828-829 (4) (a), (b). See *Willis*, 304 Ga. at 692 (2) (holding that, where the medical examiner testified that "any one of the wounds would have caused [the victim's] death," separate convictions for aggravated assault and malice murder were not authorized); *Alvelo v. State*, 290 Ga. 609, 611-612 (2) (724 SE2d 377) (2012) (holding that aggravated assault merged into malice murder where the pathologist "did not describe any specific wound as being a fatal injury" and there was no evidence that the victim suffered separate "fatal" and "non-fatal" injuries); *Coleman v. State*, 286 Ga. 291, 295 (3) (687 SE2d 427) (2009) (holding that an aggravated assault charge merged with malice murder because, although a "series of shots [were] fired," the

36

medical examiner "testified that the cause of death was 'gunshot wounds'" without "identify[ing] any injury as the fatal shot," and thus there was no "evidence that one wound was fatal and was preceded by . . . the infliction of non-fatal wounds"). Accordingly, we vacate Appellant's convictions and sentences for Counts 7 and 9.

*Judgment affirmed in part and vacated in part. All the Justices concur.*

Decided April 16, 2024.

Murder. Dawson Superior Court. Before Judge Gosselin.

*Kyle A. Denslow*, for appellant.

*Lee Darragh, District Attorney, Conley J. Greer, Assistant District Attorney; Christopher M. Carr, Attorney General, Beth A. Burton, Deputy Attorney General, Clint C. Malcolm, Meghan H. Hill, Senior Assistant Attorneys General*, for appellee.